## Poor *et al. versus* McClure.

1. The lines fixed under the Act of April 16th 1858, " to establish high and low-water lines on the Allegheny," &c., were not to settle private boundaries, but to define and fix the boundaries of high and low-water between riparian owners and the Commonwealth, for the benefit of those exercising the public right of navigation.

2. The beds, gravel and sand-bars of the navigable rivers of Pennsylvania, are not subject to private appropriation under the ordinary land laws.

3. Surveys on navigable streams do not give the riparian owner title beyond the ordinary low-water line; between it and ordinary high-water line, the ownership is subject to the public right of navigation.

4. A channel between an island in the Allegheny river and the mainland, was filled up by reason of a dam across it and a street also, made under an Act of Assembly ; the land where the channel had been was susceptible of cultivation. *Held*, such land could not be appropriated by warrant and survey in the ordinary forms of the Land Office, the legal presumption being that the land is still part of the bed of the river.

5. Lands within the ordinary jurisdiction of the Land Office, are those granted upon application, according to the forms of the office, and fit for settlement and cultivation, and not within the navigable rivers.

6. Surveys along the margin of the smaller streams extend title *ad filum aquæ.*

7. Stover *v.* Jack, 10 P. F. Smith 340, adopted. Wainwright *v.* McCullough, 13 Id. 66, re-affirmed.

November 14th 1873.   Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Error to the Court of Common Pleas of *Allegheny county :* Of October and November Term 1873, No. 97.

This was an action of trespass, q. c. f., brought January 2d 1873, by Levi Poor, John W. Dunn and W. J. Poor, against W. G. McClure.

The plaintiffs declared for tearing down a fence, &c., on the *locus in quo.*

The defendant pleaded not guilty, and pleaded specially, that at the time of the committing of the alleged trespasses, the title to the *locus in quo* was not in the plaintiffs, but in the city of Pittsburg.

On the trial, January 22d 1872, before Starrett, P. J., it appeared :—

That on the 31st of December 1787, a patent was issued by the Commonwealth to Conrad Winebiddle, for a tract of land containing 121 acres, on the Allegheny river, in Pitt township, Westmoreland county (now in Allegheny county).   On the 22d of July 1806, a patent issued to George Wallace, for an island called " Cork's Island," in the Allegheny river, opposite the tract granted to Winebiddle.   This island was afterwards also known as " Wainwright's Island."   In 1806, Wallace conveyed " Cork's Island " to Wainwright.   Wainwright became the owner also of part of the Winebiddle tract on the mainland ; the remainder of that tract had in 1814 become vested in W. B. Foster.   On the 12th of August

[Poor v. McClure.]

1844, McCullough obtained an equitable title under articles of agreement, to Cork's or Wainwright's Island. McCullough then constructed a dam across the channel between the island and the mainland, to give him mill power. Prior to this time there had been a navigable channel between the island and the mainland; there was evidence that this channel before, and especially after the erection of the dam, had gradually been filling up.

On the 11th of May 1853, an Act of Assembly was passed authorizing McCullough to raise his dam three feet. Under this act McCullough raised his dam; it obstructed the navigation of that branch of the river, and caused a more rapid filling up of the channel, until there was very little channel left.

The *locus in quo* was the filled-up channel between the mainland and the island, &c.; it was at that time in the borough of Lawrenceville (afterwards incorporated into the city of Pittsburg).

On the 16th of April 1858, an Act of Assembly was passed, authorizing the District Court of Allegheny to appoint commissioners to examine the shores, to survey and make thereon lines of ordinary low-water and lines of ordinary high-water along the Monongahela, Allegheny and Ohio rivers; the lines to be such as would secure and perpetuate the navigable channels of those rivers, &c., and as would be most suitable for the benefit of the public at large. The commissioners to return their survey to the District Court of Allegheny county. The act further enacted that all riparian rights then vested in the Commonwealth, between the high-water lines and the rivers should be vested " in the several corporations within whose limits the same now is or hereafter shall lie."

Under the authority of this act, the commissioners ran the lines and made report according to law.

On the 12th of April 1867, the burgesses and council of Lawrenceville were authorized by Act of Assembly to extend certain streets " across that portion of the Allegheny river lying between Wainwright's Island and the main shore, and fill up or embank that portion of said river occupied by the extension of the aforesaid streets so as to make a uniform grade." The streets were accordingly extended and filled up from the mainland to the island; this closed the channel altogether, and the *locus in quo* had ceased to be part of the bed of the river.

On the 6th of April 1867, by virtue of an Act of Assembly, the borough of Lawrenceville became part of the city of Pittsburg.

On the 16th of March 1868, Dunn and W. J. Poor, two of the plaintiffs, obtained a warrant for 15 acres of land, being the *locus in quo.*

A survey was made and patent issued to the warrantees, December 8th 1868.

On the 8th of April 1870, an Act of Assembly was passed,

which recited the grant by the Commonwealth of Wainwright's Island and of the land on the mainland; and the making of high and low-water lines on the Allegheny and the other rivers, by virtue of the Act of April 16th 1858; and the Act of April 12th 1867, authorizing the municipal authorities of the borough of Lawrenceville to extend their streets across the Allegheny river to Wainwright's Island, &c., " and by means thereof, the said portion or branch of said river between the said island and the main shore, has been vacated, and has ceased to be a part of said river." The act then enacted that the bed, &c., of the river so vacated, should be vested in the city of Pittsburg, " the boundaries of said bed on each side * * * are the low-water lines established, &c., under the Act of April 16th 1858, and the same shall be held and improved by said city for public purposes as a street, in the same manner as other streets are held and improved by said city, and the rights of the owners of land on each side thereof shall extend to said low-water lines severally, and said owners shall hold up to said low-water lines without any let, &c., by the Commonwealth, the public, or the city of Pittsburg," &c.

The plaintiffs erected a fence on the *locus in quo ;* the defendants, acting under the city of Pittsburg, took the fence down; this was the trespass complained of.

The following are points of the plaintiffs:—

3. If the channel of the Allegheny river between Wainright's Island and the southern shore was filled up, not by natural causes, but wholly or mainly in consequence of the erection of the dam and bridges across the same, the ground thus made belonged neither to the owner of the island nor to the owners of the mainland, but the title to the same remained in the Commonwealth.

4. If at the dates respectively of the warrant to Dunn and Poor, the survey made pursuant thereto and patent to them, the waters of the Allegheny river flowed wholly northwardly of what was formerly Wainwright's Island, and the space between the said former island and the main shore was filled up from the causes mentioned in the third point, and at said dates was dry land and had a soil susceptible of cultivation, and in point of fact had ceased to be a part of the bed of the river, it was subject to appropriation, survey and patent.

The court instructed the jury if they believed the facts to be as stated in plaintiffs' third and fourth points, to find a verdict in their favor, and requested that the damages be assessed separately for the trespass committed on the land between the low-water lines as fixed by the commissioners, and that between the original low-water lines of the Wmebiddle and the island patents; subject to the opinion of the court on the question of law reserved, to wit, whether, under the facts established by the verdict, the plaintiffs acquired any title at all under the patent to Dunn and Poor.

[*Poor v. McClure.*]

The jury found for plaintiffs, subject to the opinion of the court on the reserved question.

The court afterwards entered judgment for the defendant on the reserved question *non obstante veredicto.*

The plaintiffs took a writ of error, and assigned for error that the court entered judgment for the defendant *non obstante veredicto.*

*H. H. McCormick* and *M. W. Acheson,* for plaintiff in error.— This ground belonged to the Commonwealth: Wainwright *v.* McCullough, 13 P. F. Smith 66. The Act of April 12th 1867, Pamph. L. 1204, vacated that part of the channel of the river; and the vacation did not give the owners of the island or main shore anything between the low-water lines: Bailey *v.* Miltenberger, 7 Casey 37. The new formation being from artificial causes, it did not vest in the owner of either shore as an accretion: Angel on Watercourses, sect. 53, *et seq.;* Hopkins' Academy *v.* Dickinson, 9 Cushing 544.

*D. T. Watson* and *R. Woods* (with whom were *T. S. Bigelow* and *B. F. Lucas*), for defendant in error.—The riparian owner holds title to the accretions called "*alluvion,*" which adhere to the shore and thus increases the land he owns: Washburne on Easements 319, 320; Yates *v.* Milwaukee, 10 Wall. 504; Cook *v.* City of Burlington, 30 Iowa 94; New Orleans *v.* United States, 10 Peters 662; Zug *v.* Commonwealth, 20 P. F. Smith 141. The Acts of Assembly give no authority to the Land Office to issue patents for the bed of a river except to mine: Brandt *v.* McKeever, 6 Harris 70. There being no authority by Act of Assembly to issue patents for land made by filling the channel, the patent to plaintiff was void: Bagley *v.* Wallace, 16 S. & R. 245; Carson *v.* Blazer, 2 Binn. 477; Hunter *v.* Howard, 10 S. & R. 243; Fisher *v.* Cader, 1 Wall. Jr. 69; Freytag *v.* Powell, 1 Wharton 536. The beds of the river being navigable, were the highways held by the state for the use of the public. At the time of the revolution the people of each state acquired the absolute right to all their navigable waters and the soil under them; Martin *v.* Waddell, 16 Peters 307; Russell *v.* Jersey Co., 15 Howard 426; Bennett *v.* Boggs, Baldwin 60. This right became vested in the state, but in trust for the public use: Rundle *v.* Delaware Canal Company, 14 Howard 80. The state could not dispose of property so held to a private individual for private use. The Act of 1870 does not so dispose of the land, but vests it in the city, within whose limits it lay, for the public use.

Chief Justice AGNEW delivered the opinion of the court, January 5th 1874.

That the Allegheny river is a navigable stream, and was so recognised before the year 1798, has been shown in Wainwright *v.*

McCullough, 13 P. F. Smith 66. The Act of 21st March 1798 was but declarative of the fact, as to the Ohio and Allegheny; its manifest purpose being to reach and declare the large tributaries of these rivers navigable streams, viz.: the Big Beaver, emptying into the Ohio, and French creek, Conewango, Cassawanga, Little Conneaut, Toby's, Oil, Brokenstraw and Red Bank creeks, tributaries of the Allegheny. In the early history of the state, the Allegheny was known as the Ohio, and was so described in the treaty with the Indians made at Fort Stanwix, November 5th 1768, and also in the treaty made at Fort Stanwix in October 1784, 2 Sm. Laws 122, 123. Part of the western and southern boundary lines are thus described in the treaty of 1768: "to the said west branch of the Susquehanna, then crossing the said river and running up the same on the south side thereof, the several courses thereof to the fork of the same river, which lies nearest to a place on the river *Ohio* called the *Kittanning*, and from the said fork by a straight line to Kittanning aforesaid, and then *down the said river Ohio* by the several courses thereof, to where the western bounds of said province crosses the *same river*, and then with the said western bounds to the south boundary thereof, and with the south boundary aforesaid to the east side of the Allegheny hills, &c." The treaty of October 1784 is for the land within the state lying west and north of the purchase of 1768, and is bounded eastward by the line of the treaty of 1768, reciting it by quotation in the language just given. The treaties were not adverted to in Wainwright *v.* McCullough. They throw light on the 13th sect. of the Act of 8th April 1785, excepting islands in the Ohio, Allegheny and Delaware from ordinary appropriation.

The bed, bars and shoals of the Allegheny are governed, therefore, by the laws relating to the beds, &c., of navigable streams. This brings us to the question as to the validity of the warrant from the Commonwealth to John W. Dunn and Wm. G. Poor, for fifteen acres of unimproved land, dated 16th March 1868, and the survey and patent thereupon. The land taken up under the warrant is admitted to be the old channel of the Allegheny river between Wainwright's Island and the main shore on the southeastern side of the river, lying also between the patent to Conrad Winebiddle, dated December 31st 1787, and the patent to George Wallace, July 22d 1806, surveyed on an order of April 7th 1798, for the island then known as Cork's Island, three miles above Pittsburg. A special verdict for the plaintiff was rendered, subject to the reserved questions whether any title passed under the patent to Dunn and Poor, and if so, whether it extended to the original low-water lines of the Winebiddle and Wallace patents, or to the low-water lines established by the commissioners under the Act of 16th April 1858, Pamph. L. 326. The decision of the first question in the negative will render any decision on the second question

[Poor v. McClure.]

unnecessary.  But as the case has been argued with reference to the low-water lines of the commissioners, it will be proper to say we adhere to the interpretation given to the effect of the lines of the commissioners in Wainwright v. McCullough.  These lines were not to settle questions of private boundary, but to define and fix permanently the boundaries of high and low-water between the riparian owners and the state, for the benefit of those exercising the public right of navigation.  As said in that case, the subject itself is incompatible with a regulation of boundaries between land owners, for the bed of the stream belongs to the state and necessarily lies between and excludes controversy with an opposite owner, while the act itself refers to no other lines than those of high and low water.  Another consideration exhibiting this is, that the high-water line, standing precisely on the same basis with the low-water line, as to defining and fixing it, being wholly within the lines of the owner's survey, could by no possibility have any reference to the boundaries of other persons.  The purpose of the legislature evidently was so to define and fix these lines with accuracy, in and near to Pittsburg, as to prevent encroachments on the public right of navigation, either by building beyond the low-water line into the stream, or by placing obstructions to navigation between high and low-water mark.  How far the line of the commissioners, when differing from the natural low-water line, will bind the riparian owner in a question of title to the soil, was not a question decided in Wainwright v. Wallace, and is not intended now to be determined, holding as we do in this case that the appropriation of the channel of the river by Dunn and Poor was without authority of law.

The beds, gravel and sand-bars of the navigable rivers of this state are not subject to private appropriation under the ordinary system of land laws : Allegheny City v. Read, 12 Harris 39; City of Allegheny v. Nelson, 1 Casey 332; Brandt v. McKeever, 6 Harris 70.  This rule grew out of the interests of the state in preserving the navigation of her great rivers, and as a consequence it has always been held that the surveys on navigable streams do not extend the title of the riparian owner beyond the ordinary low-water line, and between it and ordinary high-water line the ownership of the land is subject to the public right of navigation.  These lines were considered and their extent defined in Stover v. Jack, 10 P. F. Smith 340; see also Wood v. Appal, 13 P. F. Smith 210; Grant v. White, Id. 271.  These positions bring us to the precise question before us, to wit, whether a warrant can be taken out in the ordinary forms of the Land Office to appropriate land made in the channel by filling up, caused by damming up the water in one place and making a street across it in another, raised by embankment under authority of an Act of Assembly.  No precedent for such an appropriation has been shown or is known to us, while

[Poor *v.* McClure.]

it is contrary to the practice of the Land Office since the extinction of the rights of the proprietaries of the province by the Act of 27th November 1779, 1 Sm. Laws 479. The sixth section of that act subjected the "said soil and lands" to such disposal, alienation and appropriation as the legislature then or thereafter should deem meet and expedient. The first act establishing a land office under the Commonwealth, was passed April 9th 1781, 1 Sm. Laws 529. The twelfth section provided that no grant, warrant or location, after the 4th of July 1776, should be valid for lands or lots within ten miles of Philadelphia, within three miles of a county town, or for a greater quantity than five hundred acres, or *any lands or lots not granted in the usual forms of the Land Office*, or lands not within the Indian purchase." The next general act for opening the Land Office for granting and disposing of the unappropriated lands within the state, passed April 1st 1784, 2 Sm. Laws 102. The second section confined the acts of the officers of the Land Office, as to locations, warrants, patents, &c., to doing and performing these functions, "agreeable to *the former customs and usages* of the said offices." The sixth section directed that when the Indians should be satisfied for the unpurchased lands within the state, the surveyor-general should appoint district surveyors, "for laying out all such lands within the said purchase as shall be found *fit for the purpose of cultivation*," &c. This was followed by the Act of 3d April 1792, granting the lands north and west of the Ohio and Allegheny rivers and Conewango creek, to settlers and to warrant holders. The ninth section provides that the holders of warrants shall cause them to be *settled* and *improved* within two years after the date of the warrant. Two years later came the Act 22d April 1794, forbidding applications for *unimproved* lands in the new purchase. It was followed by the Act of 22d September 1794, prohibiting applications for lands, except for such as had been or should be settled, grain raised and a person residing thereon. This current of legislation shows that the lands within the ordinary jurisdiction of the Land Office, were those granted upon application according to the usual forms of the office, and such as were fit for settlement and cultivation, and were not within the navigable streams. This is evidenced also by the exception of islands in the Susquehanna, Ohio, Allegheny and Delaware, in the 13th section of the Act of 8th April 1795, 2 Sm. Laws 317, and by the description in the Act of 3d April 1792; the first section of which describes the land for appropriation as lying east of the Allegheny river, and the second section describes the land as lying west of the Allegheny river; in both instances excluding the river itself. In all this legislation we discover a fixed intent to open to general appropriation ordinary land outside of the navigable streams, and as a consequence no surveys were made across these streams. As to the

[Poor *v.* McClure.]

smaller streams, it was different, the surveys often crossing them, and when laid along the margin, the law extended the title *ad filum aquæ:* Coovert *v.* O'Conner, 8 Watts 470.

The case before us, therefore, does not fall within the ordinary jurisdiction of the Land Office, the land being within the acknowledged channel of the river, and the filling up arising from artificial means, and not by the slow process of natural deposit. The case is exceptional, and therefore requires a particular or special authority of law to open it to general or particular appropriation. No provision is made for such a case. The legal presumption from the *locus in quo* is that the land is still a part of the bed of the river, until some legal proceeding shall have established the contrary, and a law shall open it to private appropriation. Without this, the land officers, who are ignorant of the peculiar circumstances of the case, may be betrayed into a grant of the river bed prejudicial to the rights of the public. To assume that the land is fast land and not subject to overflow at ordinary high water, might be to make a grant against the fact of the case. Such a case is not to be governed by the ordinary rule of appropriation, but like an escheat or a forfeiture accruing to the Commonwealth, must be provided for by a law specially applicable to it: Bagley *v.* Wallace, 16 S. & R. 245 ; Blaine's Lessee *v.* Crawford, 1 Yeates 287 ; Freytag *v.* Powell, 1 Wharton 536. The land in question was therefore not subject to be taken up under the warrant to Dunn and Poor, and the judgment must be affirmed.

Affirmed.