619 A.2d 1070

**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**David C. STREATER.**

Superior Court of Pennsylvania.

Argued Sept. 9, 1992.

Filed Jan. 27, 1993.

Kevin F. McCarthy, Asst. Dist. Atty., Pittsburgh, for the Com., appellant.

Mitchell A. Kaufman, Asst. Public Defender, Pittsburgh, for appellee.

Before ROWLEY, President Judge, and CAVANAUGH, McEWEN, DEL SOLE, BECK, TAMILIA, KELLY, POPOVICH and FORD ELLIOTT, JJ.

TAMILIA, Judge:

The Commonwealth takes this appeal from the Order of July 26, 1990, suppressing evidence seized as a result of the vehicle stop and subsequent arrest of appellee, David Streater.[1]

The facts of this case, as summarized by the trial court, are as follows.

On August 6, 1989, Pittsburgh City Police Officer Joseph F. Tersak was on routine patrol in the area of Seventh Avenue and William Penn Place. He observed Mr. Streater operating a light blue vehicle with an expired registration plate. As he approached the vehicle he observed scrape marks and glue on the lower right hand side of the license plate. He suspected the plate had been altered. Mr. Streater was then asked to step out of the automobile where he was placed under arrest, handcuffed and taken to the patrol car. Due to traffic conditions attributable to the Three Rivers Regatta, Officer Tersak requested a police wagon with two (2) officers to assist him at the scene. Upon arrival, Officer Tersak asked Officer White to drive Mr. Streater's car to Zone 2 Police Station, where it would be towed to the City Pound. Officer White testified that as he entered the automobile he observed on the front seat a bag of approximately seven pieces of suspected cocaine and a large wad of money.

---

1. The Commonwealth has certified that the suppression Order terminates or substantially handicaps its prosecution of appellee. *Commonwealth v. Dugger,* 506 Pa. 537, 486 A.2d 382 (1985).

(Slip Op., Ross, J., 11/27/90, pp. 1–2.) Appellee was charged with possession of a controlled substance,[2] possession with intent to deliver a controlled substance,[3] possession of drug paraphernalia [4] and possession of an altered document or plate.[5] A suppression hearing was held, following which the court concluded that because the offense which led to the stop was a violation of the Vehicle Code and appellee was a resident of the Commonwealth, the correct procedure would have been to issue a citation or obtain the necessary information for filing a complaint. Since the court concluded that appellee's arrest was unlawful, all evidence seized as a result of the arrest was suppressed.

██ When reviewing the trial court's ruling on a suppression motion we must

> determine whether the factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Medley,* 531 Pa. 279, 612 A.2d 430, 432 (1992).

The Commonwealth has framed the sole issue in this case as follows:

> THE SUPPRESSION COURT ERRED IN HOLDING THE ARREST UNLAWFUL BECAUSE A POLICE OFFICER MAY ALWAYS MAKE A WARRANTLESS ARRESTS [sic] FOR MISDEMEANORS COMMITTED IN HIS PRESENCE PURSUANT TO THE COMMON LAW RULE, AS CODIFIED IN PA.R.CRIM.P. 101(2), AND OFFICER TERSAK HAD PROBABLE CAUSE TO BELIEVE THAT APPELLEE WAS IN POSSESSION OF

**2.** 35 P.S. § 780–113(a)(16).

**3.** *Id.,* § 780–113(a)(30).

**4.** *Id.,* § 780–113(a)(32).

**5.** 75 Pa.C.S. § 7122(3).

AN ALTERED LICENSE PLATE, IN VIOLATION OF 75 PA.C.S.A. § 7122(3), A MISDEMEANOR OF THE FIRST DEGREE.

Based upon our review of the issue, we find the suppression court erred, as a matter of law, in its interpretation and application of Pa.R.Crim.P. 101(2), and we reverse.

■ We must begin our analysis, as did the suppression court, with the Rules of Criminal Procedure which provide the procedures for initiating criminal proceedings. Rule 101 states:

Criminal proceedings in court cases shall be instituted by:

1. filing a written complaint; or

2. an arrest without a warrant when the offense is a felony or misdemeanor committed in the presence of the police officer making the arrest; or

3. an arrest without a warrant upon probable cause when the offense is a felony; or

4. an arrest without a warrant upon probable cause when the offense is a misdemeanor not committed in the presence of the police officer making the arrest, when such arrest without a warrant is specifically authorized by statute.

Pa.R.Crim.P. 101.[6] The suppression court went on to conclude "the Vehicle Code limits the power of the police to arrest without a warrant" (Slip Op. at 3). However, section 6304 of the Vehicle Code provides:

§ 6304. Authority to arrest without warrant.

(a) Pennsylvania State Police.—A member of the Pennsylvania State Police who is in uniform may arrest without a warrant any person who violates any provision of this title in the presence of the police officer making the arrest.

---

**6.** As one commentator noted: "An initial problem exists for anyone trying to determine when such 'specifically authorized' arrests can take place. These grants of power are not collected in any one place, but instead they are scattered throughout the Crimes Code, the Vehicle Code, and elsewhere." McCarthy, *Warrantless Arrests in Pennsylvania*, 92 Dick.L.Rev. 105, 114 (1987).

(b) Other police officers.—Any police officer who is in uniform may arrest without a warrant any nonresident who violates any provision of this title in the presence of the police officer making the arrest.

(c) Other powers preserved.—*The powers of arrest conferred by this section are in addition to any other powers of arrest conferred by law.*

75 Pa.C.S. § 6304 (emphasis added). The suppression court held that a motor vehicle violation, even for a misdemeanor such as section 7122(3), did not permit arrest of a local citizen except by the state police. This interpretation is erroneous because the arrest powers of police are not limited by the Vehicle Code, unless so specified, and the Code must be read in pari materia with the Crimes Code and the Rules of Criminal Procedure to determine if and when an arrest is proper. The specific language of section 6304(c) actually *extends* the power to arrest. 75 Pa.C.S. § 6304(c).

Out of the literally dozens of offenses under the Vehicle Code, a mere handful are designated as misdemeanors, the remainder being summary in nature. The misdemeanors are deemed to require a different treatment because of their unique qualities calling for greater arrest power and ultimately a more severe penalty. Greater arrest powers are required to assure the actor will be brought to justice and evidence obtained at the time of arrest can be secured so as to be available at trial or to prevent the continuance of the illegal activity. Examples are driving under the influence (§ 3731), homicide by vehicle (§ 3732), accidents involving death or personal injury (§ 3742), removal or falsification of identification numbers (§ 7102) and altering, forging or counterfeiting documents and plates (§ 7122), the present offense. In most of these violations proceeding by citation could result in the loss of evidence essential to the conviction as the evidence would travel with the actor and his vehicle. Arrest is necessary, as here, to preserve the evidence or to assure proper identification and availability for trial.

The analysis we employ today is not novel. In *Commonwealth v. Neufer,* 264 Pa.Super. 553, 400 A.2d 596 (1979), this

508

Court held section 6304 incorporated by reference the authority to arrest for a summary offense, when that authority exists outside the Vehicle Code. In *Neufer,* the defendant was arrested for "pedestrian under the influence," a summary offense under the Vehicle Code. By looking "elsewhere to determine whether any authority [exists] to make a warrantless arrest," *Id.* at 559, 400 A.2d at 599, and finding arrest authority existed in cases of drunkenness and disorderly conduct under the Second Class Township Code of 1933, 53 P.S. § 65591, the arrest was held to be valid.

*Neufer,* of course, was a case involving a summary offense, but its underlying principle extends to the case before us. The arrest in this case, if anything, has greater validity because of the explicit powers of police to arrest pursuant to Pa.R.Crim.P. 101. To hold otherwise requires us to find the rules of criminal procedure do not apply equally to motor vehicle cases. The rules provide that in summary offenses, unless specified otherwise, proceedings are instituted by citations. In misdemeanor cases, proceedings are commenced by written complaint or arrest without warrant when the misdemeanor occurs in the presence of the police officer, unless otherwise provided by statute (example being driving under the influence). Felony cases are instituted by written complaint, arrest without warrant upon probable cause or when the felony is committed in the presence of the police officer. There are no exceptions and special considerations to the means of instituting proceedings.

▬▬▬ It is not disputed generally, nor is it the subject of debate in this case, that at common law a police officer was authorized to effect a warrantless arrest for any misdemeanor committed in his presence. Rule 101 is merely the codification of the common law rule. It follows, then, that if Officer Tersak had probable cause to make a warrantless arrest of appellee for a violation of section 7122 of the Vehicle Code, a first degree misdemeanor,[7] the arrest was legal. Probable

7. Section 7122 provides:
    **Altered, forged or counterfeit documents and plates.**

cause for a warrantless arrest exists where the facts and circumstances which are within the knowledge of the officer at the time of arrest, and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution to believe the suspect has committed or is committing a crime. *Commonwealth v. Rodriguez*, 526 Pa. 268, 585 A.2d 988 (1991).

Officer Tersak testified he stopped appellee's automobile because of the discrepancy between the temporary registration sticker on appellee's license plate and the letters on the plate indicating it was approximately four years old. As he approached the vehicle, Officer Tersak observed a residue of glue and scratch marks where the expired registration sticker apparently had been removed, leaving only the temporary sticker, and altering the plate to make it appear to be valid.

We find, based upon his observations, Officer Tersak had probable cause to arrest appellee under Rule 101(2) for a continuing violation of section 7122. The subsequent seizure occurred pursuant to a valid arrest, and was therefore lawful. Consequently, suppression of the evidence was improper, and we remand for trial on all charges.

Order reversed; remanded for trial.

Jurisdiction relinquished.

Concurring Opinion by KELLY, J., joined by McEWEN, J.

KELLY, Judge, concurring:

I agree with the majority's reversal of the suppression court's conclusion that because Officer Tersak's initial arrest of the appellant for violation of 75 Pa.C.S.A. § 7122(3) was unlawful, all evidence seized as a result of the arrest must be

A person is guilty of a misdemeanor of the first degree if the person, with fraudulent intent:

&ast;   &ast;   &ast;   &ast;   &ast;   &ast;

(3) has possession of, sells or attempts to sell, uses or displays a certificate of title, registration card or plate, driver's license, inspection certificate, proof of insurance or any other document issued by the department, knowing it to have been altered, forged or counterfeited.

suppressed. However, I disagree with the majority's conclusion that the initial arrest of appellant was lawful under Pa.R.Crim.P. 101. This rule, the majority maintains, merely codified the common law rule permitting police officers to effectuate warrantless arrests for any misdemeanor committed in his or her presence., I believe the majority opinion completely ignores our Supreme Court's decision in *Commonwealth v. Levesque*, 469 Pa. 118, 364 A.2d 932 (1976) where the court, in interpreting the prior Pa.R.Crim.P. 101, held that Pa.R.Crim.P. 101 does not speak to the validity of arrests under the Vehicle Code but only to the initiation of proceedings in court cases. Thus, I do not believe that Pa.R.Crim.P. 101 is a codification of the common law rule authorizing a police officer to effectuate a warrantless arrest for any misdemeanor committed in his or her presence.

Recently, in *Commonwealth v. Bullers*, 410 Pa.Super. 176, 599 A.2d 662, *appeal granted*, 529 Pa. 639, 600 A.2d 1257 (1991), this Court was asked to consider, "[w]hether the authority of a police officer to arrest without a warrant extends to the summary offense of underage drinking under circumstances where the violator does not exhibit disorderly conduct, a breach of the peace, drunkenness or other irregular behavior." *Id.* 599 A.2d at 663. In concluding that such an arrest was not authorized, the panel opined, "We have recently stated that, '[w]hen vesting a group with police powers and duties, the *Legislature* does so with specificity.'" *Commonwealth v. Bullers, supra,* 410 Pa.Super. at 184, 599 A.2d at 666 (emphasis added), *quoting Commonwealth v. Leet*, 401 Pa.Super. 490, 493, 585 A.2d 1033, 1035 (1991), *appeal granted*, 529 Pa. 647, 602 A.2d 857 (1992). This Court in *Bullers* declined the invitation to extend arrest powers noting, "[O]ur legislature has demonstrated its ability to clearly and unambiguously 'specifically authorize' arrests in the context of summary offenses and otherwise." Because the legislature had not authorized the arrest in *Bullers*, no other authority to arrest was found to exist. *Id.* 410 Pa.Super. at 186, 599 A.2d at 667.

Similarly in *Commonwealth v. Leet, supra,* an *en banc* panel of this Court was asked whether deputy sheriffs had the

authority to make warrantless arrests for Vehicle Code violations committed in their presence. In concluding no such authority existed, the Court recognized that the people of the Commonwealth, acting through the legislature, had vested the authority to arrest for violations of the Vehicle Code in police officers only. *Commonwealth v. Leet, supra*, 401 Pa.Super. at 499, 585 A.2d at 1038. The Court reasoned that for it to expand the powers of the deputy sheriff to make such arrests "would violate the tenet that when the legislature intends to vest a group with police powers, it does so with specificity." *Id.*

Authority to arrest for violations of the Vehicle Code may be found in section 6304 of the Code which provides:

§ 6304. **Authority to arrest without warrant.**

(a) Pennsylvania State Police.—A member of the Pennsylvania State Police who is in uniform may arrest without a warrant any person who violates any provision of this title in the presence of the police officer making the arrest.

(b) Other police officers.—Any police officer who is in uniform may arrest without a warrant any nonresident who violates any provision of this title in the presence of the police officer making the arrest.

(c) Other powers preserved.—The powers of arrest conferred by this section are in addition to any other powers of arrest *conferred by law.*

75 Pa.C.S.A. § 6304 (emphasis added). Because appellant was a resident of the Commonwealth and the arresting officer was not a member of the state police, authority to arrest in this instance must be found in another power of arrest "conferred by law."

The majority holds such authority is found in Pa.R.Crim.P. 101(2) which states:

Criminal proceedings in court cases shall be instituted by:

      \*     \*     \*     \*     \*     \*

2. an arrest without a warrant when the offense is a felony or misdemeanor committed in the presence of the police officer making the arrest.

Pa.R.Crim.P. 101(2). The majority concludes that because appellant was arrested for a misdemeanor violation of the Vehicle Code witnessed by the officer, his arrest was valid under Pa.R.Crim.P. 101(2). I cannot agree.

In *Commonwealth v. Levesque,* 469 Pa. 118, 364 A.2d 932 (1976), our Supreme Court was asked to resolve a conflict which existed at the time between former Pa.R.Crim.P. 101 and the provision of the Vehicle Code which at the time authorized the following:

> A peace officer may, upon view or probable cause without a warrant, arrest any person violating section 1037 (driving while intoxicated) of this act in cases causing or contributing to an accident.

75 Pa.C.S.A. § 1204(a). Pa.R.Crim.P. 101 did not, at the time, allow for court proceedings to be instituted by a warrantless arrest for a misdemeanor committed beyond the presence of the arresting officer. Appellee, arrested for driving under the influence, had successfully argued in *Levesque* that because the rule did not authorize his arrest and was in conflict with the statute which did authorize his arrest, his arrest was unlawful.

In reversing the trial court and remanding for the imposition of sentence, the Court explained, "Rules 51 and 101 (of Criminal Procedure) prescribe the means of instituting criminal process only and neither discusses nor concerns the legality of arrests." *Id.* at 125, 364 A.2d at 936. The Court went on to opine:

> [I]t is clear that Pa.R.Crim.P. 101 *does not speak to the validity of arrests* under the Vehicle Code *but only to the initiation of proceedings in court cases.* Therefore, as to the legality of arrests in general, or as to the power of a peace officer to effect this particular arrest, there is no conflict between the Rule and the statute. The statute controls the grant of arrest power, and the rule, as far as its contemplation at the time, governs the means of instituting proceedings.

*Id.* (emphasis added). However, because at the time of Levesque's arrest, Rule 101 did not "contemplate the initiation of

proceedings by an arrest for a misdemeanor not within view of the arresting officer but which arrest was specifically authorized by statute," the Court was forced to "examine the procedure used in this case to determine its propriety." *Id.*

In finding that no conflict existed between the rule and the statute, the Court concluded:

> The instant procedure, arrest and contemporaneous notice that the arrest was for driving while under the influence of intoxicating liquor, substantially complied with the purpose underlying the former Rule 101 by setting the institution of proceedings against Levesque at his arrest and attaching the protection of the criminal justice system at the earliest possible moment in his confrontation with authorities.
>
> \* \* \* \* \* \*
>
> Therefore, neither the arrest nor the procedure of instituting proceedings against Levesque may serve as the basis of a suppression of evidence instantly.

*Id.* at 126–27, 364 A.2d at 936–37.

From the foregoing, I find that it is the manner of initiating criminal proceedings in the court, not the power to arrest, which is governed by the Rules of Criminal Procedure. Where statutes are silent as to the grant of arrest powers, the Commonwealth may not look to the Rules of Criminal Procedure for such authority. Thus, the majority's reliance upon Pa.R.Crim.P. 101(2) for Officer Tersak's authority to arrest the appellant is misplaced. However, I find that Officer Tersak's initial arrest of the appellant for violating 75 Pa. C.S.A. § 7122(3) was proper pursuant to the statutory powers of arrest granted to him by the legislature. I reach this conclusion under the following reasoning.

Most police officers in Pennsylvania have been granted specific authority by statutes, many of recent vintage, to effectuate warrantless arrests for misdemeanors committed in their presence. *See* 53 Pa.S.A. § 13349, enacted May 3, 1876 (granting police officers in cities of the first class powers to arrest upon view and without warrant persons committing summary offenses); 53 Pa.S.A. § 37005, enacted June 28, 1951

(granting police officers in cities of the third class powers to arrest without warrant and upon view persons committing misdemeanors or violating city ordinances). It also appears that recent statutes granting "specific authority" to execute warrantless arrests for misdemeanors and violations of township or borough ordinances committed in their view have been enacted for almost every other police officer in Pennsylvania. *See, e.g.,* 53 Pa.S.A. § 56403, enacted May 27, 1949 (first class townships); 53 Pa.S.A. § 65591, enacted July 10, 1947 (second class township); 53 Pa.S.A. § 46121, enacted February 1, 1966 (boroughs); 71 Pa.C.S.A. § 252(a), enacted December 3, 1970 (state police). Unfortunately, perhaps due to legislative oversight, a modern statute granting "specific authority" to effectuate warrantless arrests for misdemeanors committed within their view has not been furnished to police officers in cities of the second class, *i.e.* Pittsburgh. In fact, one learned commentator, cited earlier by the majority, has posited that specific statutory authority to effectuate warrantless arrests for misdemeanors committed in the officer's presence exists for police officers in every municipality in this Commonwealth except Pittsburgh. *See* McCarthy, *Warrantless Arrests in Pennsylvania,* 92 Dick.L.Rev. 115, 118–19 (1987).

However, while I am in agreement with this commentator that there is no modern statutory authority existing for Pittsburgh police officers to effectuate warrantless arrests for misdemeanors committed within their view, I disagree with the premise that the Pittsburgh police are without statutory authority to effectuate such arrests. The power to effectuate warrantless arrests for misdemeanors committed in their presence was granted by the legislature to Pittsburgh mayors when the city, with much more limited boundaries than today's metropolis, was originally incorporated in 1816. *See* "An Act to Incorporate to City of Pittsburgh." Act of March 18, 1816. The Incorporation Act of 1816 granted the mayor of Pittsburgh, as presiding officer of the select and common councils, the same powers that were vested in the mayor of Philadelphia in its Act of Incorporation of 1789. *Id.* Section V. *See*

*also* "An Act to Incorporate the City of Philadelphia" Act of March 11, 1789 Ch. MCCCLXXXIII.

It has been said that the duties of the early mayors of Philadelphia were little more than those of a chief of police. R. Weigley, *Philadelphia: A 300-Year History* 23 (W.W. Norton & Company ed. 1 1982). One early mayor of Philadelphia was described as follows:

> This Mr. Wharton was Mayor of the City in 1798, and for many years after. He was bold, intrepid, and very active, ready at a moment's notice to quell a riot. His appearance at such gatherings with staff in hand, and hat tipped a little on one side of his head, with firm step, and independent authority, would scatter the ire and quell the fire of the most ferocious mob. Philadelphia never had a more efficient and popular municipal officer.

*Id.,* citing A. Ritter, *Philadelphia and Her Merchants,* 46 (Philadelphia, Privately Printed 1860) (footnote omitted). *See also* E. Allinson and B. Penrose, *Philadelphia 1681–1887: A History of Municipal Development,* 101–102 (Philadelphia: Allen, Lane and Scott, 1887). Likewise, the mayors of Pittsburgh were fully empowered by the Act of Incorporation of 1816 to arrest upon view all persons committing misdemeanors in their presence.

Additionally, the first mayor of Pittsburgh, Ebeneezer Denny, and his successors, were empowered to appoint others to assist them in their quest to keep law and order on the public streets of Pittsburgh. *See* S. Killikelly, *History of Pittsburgh: It's Rise and Progress,* 195 (Pittsburgh, B.C. & Gordon Montgomery Co. 1906).

> Among the powers conferred by the charter, under the head of "the powers and authorities now vested by law in the Select and Common Councils of the City of Philadelphia," was the right to establish a nightly watch. By the ordinance establishing the city government, in accord with the charter, the Mayor was given authority to appoint the High Constable and four City Constables, and each constable was required to give a bond in the sum of $1,500 for the faithful performance of the duties of his office. The Mayor might

remove any constable at will. The constables were enjoined to preserve the peace, and arrest all disorderly persons, especially on Sunday, and were also to attend court, the market, and the Councils, according to appointment. The fee for each day's attendance at the market was 75 cents. It was further ordained that the Mayor should have power to appoint the Captain or Superintendent of the Watch to take care of the oil, wick and utensils of the city, and to render an account monthly to the Mayor of the quantities of every article received and remaining on hand; to take care that the watchmen perform their duties and to report forthwith to the Mayor all omissions or breaches of duty; and to aid the watchmen in preventing murders, robberies and other disorders. The Superintendent and watchmen were empowered to arrest all persons found disturbing the peace, or whom they should have cause to suspect of any unlawful or evil design, and drunken, disorderly or riotous persons, and to taken them before the Mayor or some Alderman.

F. Harper, *Pittsburgh of Today: Its Resources and People*, 201 (New York, American Historical Society 1931). *See also* Pittsburgh, "An Ordinance for the Establishment of a Permanent Watch" (March 26, 1836); Pittsburgh, "A Supplementary to an Ordinance Entitled 'An Ordinance for the Establishment of a Permanent Watch'" (August 7, 1839); Pittsburgh: "An Ordinance Empowering the Mayor to Act in Certain Case of the Breach of the Public Good Order" (April 4, 1845); Pittsburgh: "An Ordinance Authorizing the Mayor to Commission Private Watchman" (May 23, 1848).

Subsequently, in 1857, the legislature passed a "Supplementary to an Act to Incorporate the City of Pittsburgh." In this supplementary act, the legislature endowed the Pittsburgh City Councils with the powers to pass an ordinance establishing a permanent day and night police force. The act stated that the powers of the Pittsburgh Police Department were both the duties imposed upon police by law and the ordinances of the city. The act also placed the power for setting the police department's rules and regulations with the mayor. *See*

"Supplementary to an Act to Incorporate the City of Pittsburgh" Act of May 16, 1857, No. 598, section 16.[1] The Common and Select Councils of the City of Pittsburgh, shortly thereafter, passed an ordinance establishing the police department in December, 1857. *See* Pittsburgh: "An Ordinance Establishing a Police in the City of Pittsburgh" (December 7, 1857).

The powers of the Pittsburgh Police to effectuate warrantless arrest for misdemeanors committed within view were clearly stated by the Common and Select Councils in an ordinance passed on December 27, 1869. This ordinance clarified the duties of the Pittsburgh Police as follows:

*It shall be the duty of the police of the city of Pittsburgh, upon view, or upon information made and warrant issued, to arrest all persons* who may be found engaged in, or charge with violating the public peace, disorderly conduct, lewd, indecent or lascivious behavior upon the streets or other public places, creating riots or gambling, and all vagrants, common street beggars, common prostitutes, habitual disturbers of the public peace, known or reputed pickpockets, burglars, thieves, watch-stuffers, person who practice any trick, game or device with intent to swindle, persons who abuse their families, and suspicious person who can give no reasonable account of themselves and bring the same before the mayor of the city ...

*See* Pittsburgh, Ordinance Book 2. 515, § 1 (December 27, 1869) (emphasis added).

1. Act of May 16, 1857, No. 598, section 16 provides as follows:
   It shall be the duty of the councils of said city, as soon after the passage of this act as practicable, to provide for an efficient day and night police in said city; the number and compensation of said police shall be fixed by ordinance, but no ordinance decreasing the number and compensation of the police shall take effect before the next succeeding annual city election after the passage of this act, unless said ordinance so decreasing said number or compensation shall have been first approved by the mayor; and *besides the duties imposed on the police by law and the ordinances of said city,* the said police shall be subject to such lawful rules and regulations as the mayor shall from time to time prescribe.
   (emphasis added).

Thus, the power of the Pittsburgh Police Department to make arrests for misdemeanors committed in their presence was unquestionably established as a result of powers endowed on the Common and Select Councils by the legislature in the Act of May 16, 1857. A bill which was enacted seventeen years before the legislature changed its methodology for granting powers to the cities of this Commonwealth according to each city's respective population.

In 1874, our legislature enacted "The Classification of Cities Act" dividing the cities of this Commonwealth into three classes. This Act states that the powers and duties of the officers of cities of the first, second, and third class, now in existence by virtue of the laws of this Commonwealth shall remain as provided by this Act. "The Classification of Cities" Act of May 23, 1874, No. 152 section 1. "The Classification of Cities Act" then proceeds to discuss the powers of the mayors of third class cities permitting the mayor to appoint a chief of police, while making no mention of first and second class cities. The chief of police was granted the power to arrest without warrant and upon view, any person guilty of a breach of the peace, vagrancy, riotous conduct or drunkenness. *Id.* section 31. Accordingly, the powers of the mayor of Pittsburgh and his appointed police department to arrest upon view for both misdemeanors and violations of city ordinances remained as they had been before the passage of the "Classification of Cities Act." *See Woods' Appeal,* 29 P.L.J. 264 (1882) (upholding the powers of Pittsburgh police to arrest without warrant the inmates of a disorderly house).

In 1887, the legislature passed an "Act in Relation to the Government of Cities of the Second Class" which states as follows: "The police power of taking informations, making arrests and preservation of the peace, heretofore vested in the mayor, shall hereafter vest in the mayor and the police magistrates." "An Act in Relation to the Government of Cities of Second Class," Act of June 14, 1887, No. 263 section 7. However, the fact that the legislature directed the mayor to share his powers of arrest with the police magistrates did not alter the powers of the Pittsburgh police department to

arrest upon view and without warrant persons committing misdemeanor or violating city ordinances in their presence. The undisputed powers of the Pittsburgh police to arrest wrongdoers on view and without warrant was clearly recognized by the legislature in "An Act Relating to and Defining the Powers and Duties of Police Magistrates in Cities of the Second Class" Act of June 16, 1891, No. 233. In section 3 of this act, the legislature stated the powers of the police magistrates as follows:

> The said police magistrates shall likewise have full and complete power, jurisdiction and authority to administer oaths and examine witnesses, and hear, determine and punish, according to the laws and ordinances of such city, *all cases of arrests upon view, or upon information made and warrant issued, by the police of the city in which such police magistrate may reside or be appointed,* of all persons who may be found engaged in or be charged with drunkenness, disorderly conduct, selling liquor contrary to law, maintaining a disorderly house or bawdy house, lewd, indecent or lascivious behavior on the streets or elsewhere, gambling, creating riots or disturbances, vagrants, beggars, prostitutes, disturbers of the public peace, known or reputed pickpockets, burglars, thieves, watch stuffers, cheating, swindling, persons who abuse their families, and suspicious persons who can give no reasonable account of themselves, or violating any of the laws or ordinances of such city.

*Id.* (emphasis added). Thus, the June 16, 1891 Act recognized the Pittsburgh police power to arrest upon view. As there has been no legislation enacted *abrogating* these powers in the interim, the powers of the Pittsburgh Police Department to arrest upon view for misdemeanors committed in their presence remains the same today as it has been since the ordinance clarifying its duties was passed in 1869.

Moreover, the City of Pittsburgh in 1891 was much smaller geographically than today's metropolis. Much of the city's growth between 1891 and 1933 has been attributable to the consolidation of various smaller cities and boroughs with the City of Pittsburgh. The City of Allegheny, at one time the twenty-seventh largest city in the United States, before its

consolidation with the City of Pittsburgh, *see* Smull's Legislative Handbook 1905, p. 224, had its own separate government and police force[2] as did the various boroughs which also consolidated with Pittsburgh during this time period. All of these separate municipal or borough police forces were granted the powers to make warrantless arrests of persons committing misdemeanors in their view through either the "Classification of Cities Act of 1874" or the "Boroughs Act of 1897," Act of June 4, 1897, No. 101. The powers of these defunct police departments passed to the Pittsburgh Police Department upon their absorption into the Pittsburgh Police Department.

Thus, I find the Pittsburgh Police Department is sufficiently empowered by the legislature to effectuate warrantless arrests for misdemeanors committed in their presence, thereby alleviating the need to erroneously utilize Pa.R.Crim.P. 101 for a purpose for which it was not intended.[3] Accordingly, I find that Officer's Tersak's initial arrest of the appellant for the misdemeanor of possession of an altered license plate was lawful pursuant to the other powers conferred by law stated in 75 Pa.C.S.A. § 6304(c). Therefore, the evidence seized through this lawful arrest was improperly suppressed by the trial court. Hence, I concur in the result of the majority opinion.

McEWEN, J., joined this concurring opinion by KELLY, J.

**2.** It is interesting to note that the City of Allegheny, a city of the third class at the time of the passage of the "Classification of Cities Act of 1874," grew through population expansion into a city of the second class before its consolidation into the City of Pittsburgh in 1906. However, Allegheny's ascension into the status of a city of the second class did not cause its police department to lose its powers to make warrantless arrests for misdemeanors committed in its police officers' presence despite the failure of the "Classification of Cities Act of 1874" to so state. Through the application 53 Pa.C.S.A. § 22101, all laws relating to cities of the third class continued to apply to cities of that class which passed into a city of the second class through an increase in population. *See also Commonwealth v. Macferron,* 152 Pa. 244, 25 A. 556 (1893); *Commonwealth v. Wyman,* 137 Pa. 508, 21 A. 389 (1891).

**3.** I also believe that it would be prudent for the legislature to pass a modern statute reaffirming these powers for police officers in cities of the second class.