**PENNSYLVANIA POWER & LIGHT COMPANY, Appellee,**

v.

**MARITIME MANAGEMENT, INC., Appellant.**

Superior Court of Pennsylvania.

Argued June 18, 1996.

Filed March 20, 1997.

Reargument Denied June 2, 1997.

Thomas A. Brown, Milford, for appellant.

Timothy G. Lenahan, Scranton, for appellee.

Before KELLY, EAKIN and OLSZEWSKI, JJ.

EAKIN, Judge:

Maritime Management, Inc. ("Maritime") appeals from the order of the Pike County Court of Common Pleas entered December 5, 1995 permanently enjoining Maritime from selling or giving away alcoholic beverages to customers aboard its seventy-five passenger cruise ship under a validly issued liquor license. Ironically, whether the passengers on the "Spirit of Paupack" may purchase a cocktail or wine with their dinner in 1996 and beyond turns on the degree to which the Wallenpaupack Creek was involved in the commerce of northeastern Pennsylvania before being subsumed by the creation of Lake Wallenpaupack in 1927.

Lake Wallenpaupack is thirteen miles long, approximately one mile wide, and up to sixty feet deep. It was created in 1927 when appellee, Pennsylvania Power & Light ("PP & L") dammed the Wallenpaupack Creek in order to generate hydroelectric power. The creek was impounded pursuant to a license issued by the Federal Energy Regulatory Commission ("FERC"), which, by its terms, requires PP & L to allow public access to the lake.

Maritime owns and operates the "Spirit of Paupack," a fifty foot ship that sails the waters of the lake as part of that public access. The ship is a commercial vessel and has been providing dinner and sightseeing cruises since 1987. In 1989, Maritime sought a license from the Pennsylvania Liquor Control Board ("LCB") to sell alcohol aboard the ship. PP & L intervened in the application process and opposed the issuance of the license. In 1993, the Commonwealth Court ordered the LCB to issue a liquor license to Maritime. *See Maritime Management, Inc. v. Liquor Control Board,* 153 Pa. Commw. 375, 621 A.2d 1097 (1993).

Shortly after the license was issued, PP & L, as "owner" of Lake Wallenpaupack, issued a "Public Lake Use Policy" that prohibited the sale or promotional distribution of alcoholic beverages on the lake. When Maritime refused to abide by that Policy, PP & L filed a Complaint in Equity in the Pike County Court of Common Pleas seeking to enjoin Maritime from selling alcoholic beverages aboard the ship. After a hearing, the injunction was granted in a thoughtful and comprehensive opinion by the Honorable Harold A. Thompson. This appeal follows.

This case turns upon whether PP & L owns Lake Wallenpaupack; if so, it may enforce its policy. If not, Maritime may continue to serve alcoholic beverages pursuant to its validly issued license. The trial court determined that there was sufficient competent evidence to determine that PP & L is the owner of Lake Wallenpaupack. Maritime alleges the contrary, and thus contends PP & L may not enforce an injunction upon water it does not own.[1]

█ When reviewing the decision of an equity court, the chancellor's findings of fact will stand unless there has been an abuse of discretion, a capricious disregard of evidence, a lack of evidentiary support on the record

1. We note with interest the holding of the Third Circuit in *Livingston by Livingston v. Pennsylvania Power and Light,* 609 F.Supp. 643 (E.D.Pa.), aff'd, 782 F.2d 1029 (3d Cir.1986) wherein PP & L asserted that Lake Wallenpaupack was navigable and was therefore public, in order to avoid liability for an accident which had occurred on the lake. In fact, PP & L used virtually the same arguments employed by Maritime in the present case. Although PP & L avoided liability in *Livingston* on other grounds, the Third Circuit found that PP & L owned the lake.

for the findings, or an error of law. *Hahalyak v. A. Frost, Inc.*, 444 Pa.Super. 494, 502, 664 A.2d 545, 549 (1995) (citations omitted).

■ The equity court used a two-part analysis in finding that PP & L owned the lake. First, the court determined that PP & L owned the land under the lake; if it did not, it could not assert ownership of the lake itself. The owner in fee of lands beneath water has the right to control activities on the surface. *Smoulter v. Boyd*, 209 Pa. 146, 58 A. 144 (1904). The court found that current deeds and the predecessors thereto established that the bed of Wallenpaupack Creek and the now submerged adjacent lands are in PP & L's chain of title; the record supports the court's finding.

■ Second, the court found that the lake was not navigable, according to the legal meaning of the term. If a body of water is navigable, it is publicly owned and may only be regulated by the Commonwealth; ownership of the land beneath would not afford any right superior to that of the public to use the waterway. Conversely, if it is non-navigable, it is privately owned by those who own the lands beneath the water's surface and the lands abutting it, and may be regulated by them. *Lakeside Park Co. v. Forsmark*, 396 Pa. 389, 153 A.2d 486 (1959); *Conneaut Lake Ice Co. v. Quigley*, 225 Pa. 605, 74 A. 648 (1909).

Using Maritime's theory, Lake Wallenpaupack is merely a larger version of Wallenpaupack Creek; if either is or was navigable in fact, Maritime may prevail. That is, if the public had a right to use the creek, that right cannot be divested by the mere enlargement of the waterway through impoundment, or by the purchase of all submerged lands. We will examine both manifestations of the Wallenpaupack.

In *Conneaut*, the owners of an ice company contended that as record owners of the lands under, adjoining, and surrounding Lake Conneaut, they had the exclusive right to control and navigate the lake. The parties whom the company sought to exclude from the lake countered that the lake was part of the public waters of the Commonwealth and as such they were entitled to use and navigate it. *Conneaut*, 225 Pa. at 608–09, 74 A. at 649–50. Our Supreme Court first noted that an Act passed in 1798 specifically designated the lake and the creek leading into it as public streams and highways for the passage of boats and rafts. Therefore, the Court observed that "without regard to the question of navigability in fact, we have the legislative declaration that in the view of the law, Conneaut Lake is to be considered a public body of water, subject to the right of navigation by the public." *Id.* at 610, 74 A. at 650.

Maritime suggests a similar statute controls here: the Act of February 4, 1808 establishing Lake Wallenpaupack as navigable at law:

> ... Wallenpaupack Creek ... is declared a public highway for the passage of rafts, boats, and other vessels; and it shall be lawful for the inhabitants, and others, desirous of using the navigation of said creek, to remove all natural and artificial obstructions ...

However, the analysis in *Conneaut* did not end with the statute. The Court noted that such a legislative pronouncement would be essentially hortatory, and ineffective as against private property, since it would comprise a taking without compensation. The Court therefore went beyond the legislative enactment, to determine whether the waterway was navigable in fact, stating that "[i]f it is navigable in fact, then it is to be so considered in law." *Id.* at 610, 74 A. at 650. The issue of whether the legislature may statutorily render a body of water navigable was addressed in *Commonwealth v. Foster*, 36 Pa.Super. 433 (1908).[2] This court held:

> If a stream is not in fact navigable it cannot be made so by the mere passage of an act of assembly. 'If the stream is not actually navigable, so that there is no public right of way therein, a declaration by the legislature that it shall be regarded as navigable is a taking of public property for

---

**2.** The Act of 1808, declaring Wallenpaupack Creek a public highway, is virtually identical to the Act of 1814 at issue in *Foster, infra,* which declared the Lackawaxen Creek a public highway.

public use, and unless compensation is made the statute will be in conflict with the constitutional provision requiring compensation in such cases.'

*Id.* at 435 (quoting *Barclay Railroad & Coal Co. v. Ingham,* 36 Pa. 194).

 Therefore, even though the Act of 1808 considered the Wallenpaupack Creek navigable "in the view of the law," the determinative question is whether Maritime has established that the Wallenpaupack Creek was navigable in fact; it is only the latter that gave the public the right to use it free of private regulation. If navigable in fact, it is so in law; it is public and no such statute need be considered. If not navigable in fact, it is not so in law and no statute can make it public, for the owners had title to the center of the waterway that cannot be divested by mere legislation. *Smoulter v. Boyd, supra.*

The Court in *Conneaut* stated the test for navigability this way:

The use to which the body of water may be put, is the true criterion. If the body of water is sufficiently large and deep to serve the public in providing transportation to any considerable extent upon its bosom, it is sufficient to give the public an easement therein, for the purpose of transportation and commercial intercourse.

*Conneaut,* 225 Pa. at 610, 74 A. at 650.

In *Forsmark, supra,* our Supreme Court stated that the rule for determining the navigability of rivers is whether they are " 'used, or susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water.' " *Forsmark,* 396 Pa. at 391–92, 153 A.2d at 487 (quoting *Cleveland & Pittsburgh Railroad Co. v. Pittsburgh Coal Co.,* 317 Pa. 395, 397, 176 A. 7, 9 (1935)). The Court went on to state:

We think that the *concept of navigability should not be limited alone by lake or river, or by commercial use;* or by the size of the water or its capacity to float a boat. Rather it should depend upon whether the water is used or usable as a broad highroad for commerce and the transport in quantity of goods and people, which is the rule naturally applicable to rivers and to large lakes, or whether with all of the mentioned factors counted in the water remains a local focus of attraction, which is the rule sensibly applicable to shallow streams and to small lakes and ponds. The basic difference is that between a trade-route [sic] and a point of interest. The first is a public use and the second private.

*Id.* at 396, 153 A.2d at 489 (emphasis added).

 Over PP & L's objection, evidence regarding the Wallenpaupack Creek, in the form of a passage from *History of Wayne, Pike and Monroe Counties, Pennsylvania,* published in 1886 by Alfred Matthews, was read into the record by Maritime's counsel:

Through the northeastern section, the middle creek flows, and the Wallenpaupack, which forms about one third of the township boundary, is a deep, slow moving, and navigable stream for small steamboats from Wilsonville to Ledgerdale.

This apparently was the extent of Maritime's proof concerning the use of this waterway prior to the creation of the lake itself. Assuming its proper introduction, it is far from the evidence necessary for us to say the trial court abused its discretion in finding inadequate proof the creek was ever a "broad highroad of commerce" in days gone by.[3]

---

3. The insightful and thorough historical review provided by the dissent was not part of the evidence before the trial court. While a passage was read from the Matthews book, the book itself was not introduced. It was not recognized by court or counsel as authoritative, and its contents are not the subject of any verification. While some treatises are admissible in some circumstances, we find no authority allowing an appellate court to use them to supplement the record on appeal.

Our function is to determine whether the trial court committed error, based on the record; this treatise is not part of that record. The contents, beyond the passage read, are evidence which Maritime might have offered, but did not. It was not the role of the trial court to uncover this information, nor to speculate on referenced statutes enacted before the Civil War, whatever their value. *A fortiori,* it is not for us to do so. If Maritime's best case for it, no matter how much sympathy we have for their cause. Our decision must turn on what Maritime introduced, not on evidence it did not introduce. As the learned

As noted in greater detail by Judge Thompson, the record portrays Lake Wallenpaupack today as a local focus of attraction and point of interest. The commercial use of the lake is recreation and tourism. It is not akin to the Great Lakes or large rivers that border and meander through the Commonwealth and provide means to transport goods from one point to another. We see no abuse of discretion in the finding that the lake is not now navigable within the meaning of the law.

Thus the evidence of the waterway's usage both before and after impoundment is insufficient to prove navigability. Using the tests set forth in *Conneaut* and *Forsmark*, we must agree with the trial court: Lake Wallenpaupack is not navigable in fact and PP & L is therefore the owner of the waters that comprise it.

■ Maritime next contends that PP & L may not prohibit the sale of alcoholic beverages on the lake because its activities do not constitute a trespass. It is Maritime's assertion that its validly issued liquor license allows it to serve alcohol wherever the ship is operated, even on private property:

> [T]he [Liquor Control] board … may issue retail liquor licenses to steamship companies permitting liquor or malt brewed beverages to be sold in the dining compartments of steamships or vessels wherever operated in the Commonwealth, except when standing or moored in … docks within a municipality wherein sales of liquor for consumption on the premises are prohibited …

47 P.S. § 4–408(a). Based on this, Maritime asserts that it could only be restrained from serving alcohol on the ship if it were stopped in a "dry town."

■ There is no question that the LCB may issue a license to an individual or entity who plans to operate on private property where a restriction prohibits the sale of alcohol. *Appeal of Pittaulis*, 444 Pa. 243, 282 A.2d 388 (1971) (citations omitted). However, the approval of the LCB to issue a license in no way impairs the rights of persons who might be entitled and disposed to enforce a

restriction. *Pennsylvania Liquor Control Board v. Court House Motor Inn*, 13 Pa. Commw. 164, 168, 318 A.2d 383, 385 (1974). Because PP & L is the owner of the land and waters comprising Lake Wallenpaupack, it has the right to control the waters, prohibit certain uses upon the lake and enforce lawful restrictions on it, including the prohibition against alcohol contained in its Lake Use Policy.

■ Maritime next contends that PP & L is forbidden from prohibiting the sale of alcohol on the lake pursuant to conditions imposed on PP & L by the FERC. PP & L is required to operate within the bounds established by the FERC pursuant to the Federal Power Act. Article 18 of PP & L's FERC license provides:

> So far as is consistent with proper operation of the projects, the Licensee shall allow the public free access, to a reasonable extent, to project waters and adjacent project lands owned by the Licensee for the purpose of full public utilization of such lands and waters for navigation and for outdoor recreational purposes, including fishing and hunting: Provided, that the Licensee may reserve from public access such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection of life, health, and property.

We fail to see how PP & L's Lake Use Policy violates this or any other portion of their FERC license.

It is unfortunate that Maritime was put to the aggravation and expense of the protracted prior litigation to gain its liquor license, only to have heretofore unsuccessful PP & L change its tack afterward. However, questions of estoppel are not before us. The facts of record constrain us to agree with the learned trial judge; Maritime has not met its burden of proof. We must agree that Lake Wallenpaupack is not navigable and that, therefore, PP & L has the right to restrict certain activities upon the lake, including the sale of alcohol.

Order affirmed.

trial court found, that evidence was simply insufficient to meet Maritime's burden of proof.

KELLY, J., files a dissenting opinion.

OLSZEWSKI, J., files a concurring opinion.

KELLY, Judge, dissenting opinion.

I respectfully dissent from the majority's affirmance of the trial court's finding that the body of water that existed before the creation of Lake Wallenpaupack by Pennsylvania Power & Light Company (PP & L) in 1927 was never at any time a navigable body of water. Therefore, I would hold that PP & L's ownership of the land beneath Lake Wallenpaupack does not afford any right superior to that of the public to use the waterway. Thus, PP & L does not have the right to prohibit Maritime Management, Inc. from utilizing its validly issued liquor license to sell alcoholic beverages aboard its boat, the Spirit of Paupack, while it is cruising the waters of Lake Wallenpaupack. I reach this result through the following legal and historical analysis.

Pennsylvania courts sitting in equity have jurisdiction to prevent the continuance of acts contrary to the law or prejudice to the interests of individual rights. *Straup v. Times Herald*, 283 Pa.Super. 58, 67, 423 A.2d 713, 718 (1980). The party seeking the permanent injunction has the burden of showing entitlement to it. *Hempfield v. Hapchuk*, 153 Pa.Cmwlth. 173, 177 n. 6, 620 A.2d 668, 671 n. 6 (1993), *allocatur denied*, 537 Pa. 643, 644 A.2d 165 (1994). Additionally, a party seeking the injunction must establish that a clear legal right exists, not one that is doubtful or uncertain. *Straup v. Times Herald, supra* at 67, 423 A.2d at 718 (citing *Locust Club v. Hotel and Club Emp. Union, Local 568, AFL–CIO*, 397 Pa. 357, 367, 155 A.2d 27, 32 (1959); *McDonald v. Noga*, 393 Pa. 309, 312, 141 A.2d 842, 844 (1958)). Where the complainant's claim is doubtful, equity will not relieve by injunction. *Id.*

Instantly, the majority agrees with the trial court that the evidence submitted by PP & L clearly establishes that the Wallenpaupack River was never a navigable body of water, therefore PP & L has a clear and unmistakable right to preclude Maritime Management, Inc. for selling liquor on its lake. My review of the relevant statutory law and case law, together with the slender evidence submitted by PP & L in support of its claim for injunctive relief, leads me to a different result.

A court sitting in equity may consult historical books of authority though not introduced into evidence, or may admit such works to aid it in the exercise of judicial functions. *Baird v. Rice*, 63 Pa. 489, 495–500 (1871); [1] 5 Wigmore, Evidence § 1598 (Chadbourn rev. 1974). *See generally In re Siemens' Estate*, 346 Pa. 610, 613, 31 A.2d 280, 282 (1943)(citing *Wusthoff v. Dracourt*, 3 Watts 240, 243 (1834)). A copy of the law published annually by the authority of the legislature, is evidence of the statutes contained in its, whether they be public or private. *Gray v. The Monongahela Navigation Company*, 2 W & S 156, 159, 37 Am.Dec. 500, 501 (1841); *Biddis v. James*, 6 Binn. 321, 327 6 Am.Dec. 456, 457 (1814). *See also Commonwealth v. Streater*, 422 Pa.Super. 502, 513–20, 619 A.2d 1070, 1076–79 (1993)(Kelly, J., concurring).

Where a transaction that is under investigation is so remote as to be incapable of direct proof by living witnesses, authenticated historical writings, records, reports, surveys, etc., which were made by disinterested parties, apparently conversant with the facts and now dead, may be resorted to. *Arizona v. California*, 283 U.S. 423, 453 n. 3, 51 S.Ct. 522, 525 n. 3, 75 L.Ed. 1154, 1164 n. 3 (1931); *The Montello*, 87 U.S. (20 Wall) 430, 440, 22 L.Ed. 391, 394 (1874); *Laidley v. Rowe*, 275 Pa. 389, 119 A. 474, 477 (1923); *Pennsylvania Water & Power Co. v. Federal Power Com'n*, 123 F.2d 155, 160 n. 9, 74 App. D.C. 351, 356 n. 9, 42 P.U.R. 428, 434 n. 9 (1941). Historical books, which have been generally treated as authentic, are admissible as furnishing evidence of remote transactions, *Laidley v. Rowe, supra; Commonwealth v. Alburger*, 1 Whart. 469, 475 (1836); *Pennsyl-*

---

1. In *Baird v. Rice, supra,* our Supreme Court consulted numerous historical works including the papers of John Lukens, Surveyor General of Pennsylvania from 1761 to 1789, and dissolved an injunction which had halted the construction of Philadelphia's City Hall in 1870. *See also* 5 Wigmore, *supra* § 1598 note 1.

*vania Water & Power Co. v. Federal Power Com'n, supra;* especially in cases which must delve into the relatively ancient and obscure origins of commerce of the nation's rivers. *The Montello, supra* at 436 n. 8, 22 L.Ed. at 394; *Montana Power Co. v. Federal Power Commission,* 185 F.2d 491, 498 (1950), *cert. denied,* 341 U.S. 912, 71 S.Ct. 620, 95 L.Ed. 1349 (1951).

At trial, PP & L's witnesses testified that they never checked into the navigability issue or the historical uses of the Wallenpaupack River [2] before PP & L began construction of the dam in 1923.[3] (N.T. 5/30/95 at 41, 137, 139, 179). Thus, PP & L's position at trial was primarily that because the company never conducted any research on the question of the navigability of the Wallenpaupack River before the construction of the hydroelectric dam, no navigation had ever occurred on the Wallenpaupack River until the dam created the body of water now known as Lake Wallenpaupack. PP & L basically supported their claim of the right to prohibit the sale of alcohol on the entire five thousand, seven hundred acres encompassed by Lake Wallenpaupack by producing the deeds of several of its predecessors in title to establish that most of the bed of the Wallenpaupack River was in its chain of title, by showing proof of its payment of real estate taxes to the Commonwealth for the land lying beneath the waters of the lake, and through the testimony of William Carey, a Conservation Officer for the Pennsylvania Fish and Boat Commission who testified that his agency considers PP & L to be the owner of Lake Wallenpaupack.[4]

Maritime Management, Inc., on the other hand, opposed the granting of the preliminary injunction which precluded it from selling alcoholic beverages on its boat, the Spirit of Paupack, by claiming that before the hydroelectric dam was constructed, the Wallenpaupack River was a public highway. In support of its claim, Maritime Management relied primarily upon "An Act declaring part of Wallenpaupack Creek, in Wayne County, a Public Highway," Act of February 8, 1808, Chapter MMDCCCXC 1803–1808 Pa.Laws 488. Additionally, the trial court properly permitted Maritime Management, Inc. to introduce into evidence passages of the seminal historical work by Alfred Matthews, *History of Wayne, Pike and Monroe Counties* regarding the use of the Wallenpaupack River by small steamboats in the mid–19th century between Ledgeville and Wilsonville.[5] (N.T. 6/6/95 at 235–38). *See Laidley v. Rowe, supra; Baird v. Rice, supra; Commonwealth v. Alburger, supra.*

However, both parties overlooked a wealth of information pertaining to early navigation on the Wallenpaupack River. In addition to the Act of February 8, 1808, relating to navigation on the Wallenpaupack River, three additional statutes were passed by the

---

**2.** The Wallenpaupack River or Creek, as the terms were used interchangeably by the Legislature throughout the first seventy-three years of the 19th Century, was originally located entirely in Wayne County. However, Pike County was subsequently created on March 26, 1814 from part of Wayne County, (*see* "An Act erecting part of Wayne County into a separate county," Act of March 26, 1814, Chapter 3923, 1814 Pa.Laws 190–193; Pennsylvania Manual, Volume 111 at 6–37), with the Wallenpaupack River forming part of the boundary between the two counties.

**3.** At trial, the trial court properly permitted PP & L to introduce into evidence a newspaper article from the Sunday Morning, October 14, 1923 Edition of the *Allentown Morning Call* announcing in banner headlines the construction project on the Wallenpaupack River. (N.T. 5/30/95 at 13–15). *See Gulick v. Pennsylvania Railroad,* 53 P.L.J. 57, 60 (1905); *Montana Power Co. v. Federal Power Commission, supra* at 498. This rather lengthy article was replete with information concerning the project, but contained no informa-

tion regarding any prior navigation activity on the Wallenpaupack Creek except the canoes of the Indians.

**4.** PP & L also introduced, as Plaintiff's Exhibit Two, a pamphlet written by PP & L telling of the history of Lake Wallenpaupack. This pamphlet is basically a history of the construction and operation of the hydroelectric dam. It states nothing of historical significance regarding the Wallenpaupack River prior to the construction of the dam other than that the Leni–Lenape Indians named the stream Wallenpaupack, which means "the stream of swift and slow waters," and that the land was at one time owned by William Penn, who deeded it to his son who later sold it to James Wilson, a signer of the Declaration of Independence and a Justice of the United States Supreme Court.

**5.** *See* A. Matthews, *History of Wayne, Pike and Monroe Counties,* 701 (Philadelphia: R.T. Peck & Company, 1886).

Pennsylvania General Assembly regarding the same subject. Moreover, there are numerous other references to navigation on the Wallenpaupack River contained in Alfred Matthews' historical work besides those read into evidence by Maritime Management, Inc. at trial.[6]

The first of these overlooked statutes was "An Act for removing strata of rock from the bed of the Wallenpaupack river in the counties of Pike and Wayne." Act of March 11, 1833, No. 39, 1832–1833 Pa.Laws 74. *See also Wallenpaupack Creek—Improvement of Navigation* in *G. Price, Index of Local Legislation in Pennsylvania 1700 to 1892*, 659, 766 (Philadelphia: T & J.W. Johnson & Co., 1894); *Matthews, supra* at 945. In this Act, the General Assembly appropriated the sum of three thousand dollars for the purposes of improving navigation on the Wallenpaupack River. The Wallenpaupack River was shortened by approximately four or five miles and several large boulders were removed at Wilsonville which lowered the bed and gave the waters free vent. *Id.* at 945. A further purpose of the statute was to drain stagnant pools of water in the vicinity of Wilsonville which had been causing much illness to the inhabitants of the Wilsonville area. *See Id.* at 944-45. To achieve these purposes, the Legislature appointed Otto Kimble and Moses Killam of Pike County and Enoch Woodward of Wayne County as Commissioners to oversee the project and directed that these men be paid one dollar and fifty cents for each day that they were employed directing operations.[7]

In the first two-thirds of the 19th century, lumbering was a very important part of the local economy in both Wayne and Pike Counties. The lumbermen of Paupack Township, which is located in Wayne County, on the banks of the Wallenpaupack River, had a long history of utilizing the river to get their products to market.

It was many years after the first settlement that lumbering was begun with any degree of earnestness; meanwhile, farms had been cleared, and the primitive mills had been kept in motion only for the local trade. The means of marketing were poor and indirect. The roads to the Lackawaxen made hauling very bad, and rafting on the Wallenpaupack could not be carried on without a second handling of timber at the falls, which did not pay. But in time the forest of magnificent pine attracted the attention of the ship-builders, and as prices went up, the whirr of the saw was heard from every available mill-site. Only the best timber, clear and free from knots, was taken, and when drawn to Paupack Eddy and rafted down the river, it brought from seven and a half to ten dollars a thousand, the latter being considered an extremely good price. The lumber with which to construct the ship-house in the Philadelphia Navy Yard was obtained at Hemlock Hollow, as was also much of the timber used in building the great ship of that day—the "Pennsylvania." The masts, which were ninety feet long and two feet in diameter at the top end, were the largest ever felled in the township, and were drawn to Paupack Eddy by twenty yoke of oxen. These great masts were furnished by Enos Goodrich, of Salem. Among the prominent lumbermen of the township were D. Bishop, Russell Daniels, Joseph Atkinson, Rufus Bennett, D. Bingham and M. Tyler. Most of them were residents of the township. Mr. Bishop had a mill on the Middle Creek, near No. 14 Plane, and bought of Killam, Torrey and Woodward. Russell Daniels purchased the trunk-mill of William Purdy, and made a number of improvements which increased its capacity. For several years Peter Long lived at this mill and did the sawing. From him the

---

6. I disagree with the position taken by my esteemed colleagues that an appellate court reviewing the grant of injunctive relief may utilize only the statutory authority cited by the enjoined party and is prohibited from examining any pages of a properly admitted historical work other than those specifically read by the enjoined party at trial when examining the validity of the injunction. *See Baird v. Rice, supra.*

7. Both the Kimble and Killam Families were in the lumber business. Moses Killam owned and operated a saw mill on Kimble Brook, *Matthews, supra* at 950, while the members of the Kimble Family were noted lumbermen. *Id.* at 951.

mill received the *sobriquet* of "the Pete Long mill." Moses Tyloer's mill has been before referred to. It was in Killam Hollow, near the Tyloer Spring. Rufus Bennett did most of his lumbering at Hemlock Hollow, where Henry Harmon then had a mill. 'Dolph Bingham, of Pike County, was also a prominent lumberman in Paupack, and used to camp out at "Abisha Meadow," as the Beach house was called, in remembrance of Abisha Woodward, who first cleared up a place for a cabin there. Leonard Labar, the Shouses, Eli Utt and others, whose names are mentioned in connection with other townships, acquired competencies before the lumber trade in the region suffered diminution.

*Matthews, supra* at 705–06. *See also* W. Egle, M.D., *The History of Pennsylvania,* 1049 (Philadelphia: E.M. Gardner, 1883)(discussing lumbering and rafting the products to market in Pike County).

The cut logs were rafted or floated down the Wallenpaupack River to Wilsonville where previously the Wallenpaupack Falls were located.[8] This is now the site of PP & L's Wallenpaupack Hydroelectric Dam. The Wallenpaupack Falls was the place where navigation on the Wallenpaupack River temporarily ceased. The Wallenpaupack Falls were an excellent source of water-power[9] as it was impossible to run rafts over it safely. Accordingly, the owners of the water-power right had a monopoly over the lumbering that came from the forests of the region drained by the Wallenpaupack and its branches. *Matthews, supra* at 953.

The lumbering activity on the Wallenpaupack River became so hectic that the Legislature was compelled to regulate commerce on it. On April 18, 1853, the Legislature passed "An Act ..., relative to Floating of Logs in the Wallenpaupack River or Creek in Wayne and Pike Counties...." This Act provided as follows:

SECTION 8. That from and after the first day of June, one thousand eight hundred and fifty-three, it shall not be lawful for any person or persons to erect any boom or booms across or throw into, run or float any loose saw log or logs, timber, tree or trees down the Wallenpaupack creek or river, from the mouth of Five-Mile creek, to the Wilsonville falls.

SECTION 9. That any person or persons violating the provisions of the above section of this act, shall be subject to indictment in the court of quarter sessions, of the counties of Wayne or Pike, in which such offense shall have been committed, and upon conviction thereof, shall be sentenced to pay a fine not exceeding five hundred dollars, nor less than fifty dollars, at the discretion of the courts aforesaid, which fine shall be collected as other fines in criminal causes, and paid over to the supervision of the townships of Palmyra and Green, in Pike, and Paupack and Salem, in Wayne counties, in equal proportions, and by them or their successors in office shall be appropriated to and expended by them, to the removal of obstructions from said creek or river.

Act of April 18, 1853, No. 733, 1854 Pa.Laws 828 (repealed).

The passage of this Act further stresses the important role that navigation of the Wallenpaupack River played in the commerce of the citizens of the townships of Palmyra and Green in Pike County and the townships of Paupack and Salem in Wayne County, particularly the lumbermen. *See Matthews, supra* at 110, 830. (Maps of Wayne and Pike Counties). These townships are all located to the south of Wilsonville, the site of PP & L's Wallenpaupack Hydroelectric Dam. The Act made it a criminal offense to impede navigation and commerce on the Wallenpaupack River between Ledgedale and Wilsonville by constructing booms across the river or by floating lumber products

8. The Wallenpaupack River flowed in a northernly direction.

9. James Wilson sought to utilize this water-power through an ambitious plan to construct a small manufacturing center on the Wallenpaupack River, at Wilsonville, where he hoped to build one of the largest cloth mills in America, with subsidiary dye and cloth printing works. These plans, however, never came to fruition. G. Seed, *James Wilson, Scottish Intellectual, and American Statesman,* 176 (Millwood: KTO Press, 1978).

down the river to Wilsonville in chaotic fashion. Additionally, during this time period, small steamboats traversed the Wallenpaupack River between Ledgedale and Wilsonville. *See Matthews, supra* at 701.

After the interruption of navigation at the Wallenpaupack Falls in Wilsonville, navigation resumed down the Wallenpaupack River to just below Hawley where the Wallenpaupack River emptied into the Lackawaxen River. The Lackawaxen River or Lechawaxin River was first declared to be a public highway by the General Assembly in 1771. *See* "An Act declaring the rivers Delaware and Lehigh, parts of Neshaminey Creek, as far up as Barnsley's ford, and of the stream called Lechawaxin, as far up as the falls thereof, common highways, and for improving the navigation in the said rivers," Act of March 9, 1771, Chapter DCXXVI, 1700–1781 Pa.Laws 322.

On the same day that the General Assembly declared the Wallenpaupack River to be a public highway, February 8, 1808, it enacted legislation extending the public highway on the Lackawaxen River past the falls. *See* "An Act declaring part of Lackawaxen Creek in Wayne County, a public highway," Act of February 8, 1808, Chapter MMDCCCLXXXIV, 1803–1808 Pa.Laws 486.[10] Thus, the Legislature created a system of public highways starting on the Wallenpaupack River, proceeding to the Lackawaxen River, which in turn emptied out into the Delaware River.[11] *See* D. Cuff and W. Young, et al. *The Atlas of Pennsylvania*, 96(Map) (Philadelphia: Temple University Press, 1989); E. Muller, *A Concise Historical Atlas of Pennsylvania*, 96 (Philadelphia: Temple University Press, 1989); *Matthews, supra* at 954. Matthews explains in great detail that rafting on the Lackawaxen River and the involvement of residents of Paupack region in the navigation of the Lackawaxen River in the following passage:

> Colonel Hooper of Philadelphia, bought a tract of land at Lackawaxen Falls, or Mount Moriah, afterward called the Narrows by the raftsman and now Kimble

Station, at an early day,—some think as early as 1750 or 1760, others about the time Mordecai Roberts came, in 1791. He built saw-mills and got an act passed making the Lackawaxen navigable up to the falls, that gave him a monopoly above and an outlet below. This continued for many years, until those living above the falls had the stream chartered and obtained from the Legislature an appropriation to blast out the rocks at the Narrows and make the river navigable for rafts. After spending considerable money in blasting rocks the Narrows were rendered passable, but it has always been considered the most dangerous point on the river from the forks of the Dyberry to Philadelphia, because in blasting the rocks which constitute the fall it necessarily left the river rapid. It takes a sudden bend, while the rocks close in on either side, leaving the pass quite narrow, so that in avoiding Scylla on the one hand they encounter Charybdis on the other; hence raftsman who could navigate the Narrows safely always commanded greater wages for that service, and certain men spent their time during rafting season in steering through this dangerous pass.

One of the first rafts through the Narrows was run from Paupack by John Nelden, of New Jersey. William R. Walker, Ephraim Kimble, John Graham, Jonathan Brink, Joseph Atkinson, Sr., Jacob Correll, Abram Shimer, Peter Kellam, Moses Brink, Mordecai Roberts, Samuel Roberts, William Roberts, Jacob Kittle and Peter Decker were some of the old "Lackawack" raftsmen. They were sturdy men and used to gang together while running rafts. If they disliked a saloon-keeper along the river, he was cleared out. When in the city they held their own against all opposition. In saying this it should not be understood that these men were quarrelsome. They were simply great, bony, muscular fellows engaged in rough work that tended to make men strong and fearless. Abner Fish was a steersman and noted fighter. While rafting was carried on, the Delaware

---

10. This Act was passed before the creation of Pike County.

11. *See also Matthews, supra* at 333 n. 1, for a detailed history of the legislative Acts concerning navigation on the Lackawaxen River.

and Hudson Canal was built in 1827–28, beside the stream from Honesdale to its mouth at Lackawaxen village, and thence down the Delaware to Port Jervis and across to the Hudson River at Rondout. This canal is here mentioned because in its construction and operation many foreigners were employed, principally Irish. These stalwart lumbermen looked upon the canal as a kind of rival carrier and the Irishmen as intruders; hence many difficulties arose between them. Eb. Sheerer, a burly, stout man, was particularly opposed to them. He was a powerful man and there are many well authenticated stories of his physical prowess by living witnesses.

It is estimated that fifty million feet of lumber and logs were run down the Delaware River annually some years ago, and the Lackawaxen always furnished a considerable share of this lumber. The average raft of round timber was sixty-five thousand feet, although they often ran larger rafts, and of sawed lumber they sometimes had two hundred thousand feet in one raft. One of the largest rafts ever taken down the river was managed by Thomas Barnes. It consisted of three hundred sixteen-feet logs in one raft.

*Matthews, supra* at 959–60.

While the construction of the Delaware and Hudson Canal in 1827–28 and the subsequent rise of the railroads [12] shortly thereaf-

ter caused the amount of navigation to slacken, the Lackenwaxen River was still utilized by the lumbermen as their primary method of transporting their products to market. There were numerous collisions between the river raftsmen hauling lumber and the boats of the Delaware and Hudson Canal at the point where a rope ferry was utilized to propel the canal boats across the junction of the Lackawaxen River and Delaware River. Because the Lackawaxen River raftsmen continually successfully sued the Delaware and Hudson Canal for damages as a result of these collisions, the canal company commissioned the engineering genius John Augustus Roebling to construct two aqueducts to carry the canal boats over the Lackawaxen and Delaware Rivers. *See* W.H. Shank, *The Progress of Pennsylvania, Historic Bridges of Pennsylvania,* 26 (York: Buchart and Horn, 1968). The final recorded litigation between a Lackawaxen lumberman and the Delaware and Hudson Canal Company for the obstruction of navigation in the Lackawaxen River occurred in 1878. This case concerned a dam constructed at the mouth of the Lackawaxen River. *See Whitaker v. Delaware and Hudson Canal Co.,* 87 Pa. 34 (1878).[13]

As the Wallenpaupack River's importance to commerce decreased with the construction of the railroads, the Legislature passed "An Act to repeal the eighth and ninth sections of

---

12. The Erie and Wyoming Valley railroad was constructed which passed through Palmyra Township in Wayne County. Additionally, in 1848, the Pennsylvania Coal Company built a railroad from Pittston to Hawley which passed through Paupack Township in Wayne County. *Egle, supra* at 1151. *See also Matthews, supra* at 110(Map).

13. In *Commonwealth v. Foster,* 36 Pa.Super. 433 (1908), the Common Pleas Court of Wayne County held that the Lackawaxen River was non-navigable and private in a summary trespass case where appellant had crossed over the posted lands of the complainant and was fishing from the bed of the Lackawaxen Creek in Clinton Township. Appellant asserted at trial because the portion of the Lackawaxen River where he was apprehended had been declared a public highway by the Legislature on March 26, 1814, *see* "An Act declaring certain creeks therein mentioned, public highways," Act of March 26, 1814, Chapter 3919, 1812–1817 Pa.Laws 187; he was entitled to pass over the complainant's land for

purposes of fishing from the public waters. I note the section of the Lackawaxen River discussed in this opinion and the Act of March 26, 1814, *supra,* is the western branch of the Lackawaxen River which is located in Clinton Township. This part of the Lackawaxen River lies to the northwest of both the Dyberry Forks at Honesdale and the confluence of the Lackawaxen and Wallenpaupack Rivers below Hawley. Hence, this Court's affirmation of the Common Pleas Court's finding of the non-navigability of the northwestern portion of the Lackawaxen River in *Commonwealth v. Foster, supra* has no bearing on my position that the Lackawaxen River was navigable from the forks of the Dyberry Creek and Lackawaxen River, through the confluences of the Lackawaxen and Wallenpaupack Rivers and down to where the Lackawaxen River empties into the Delaware River. *See* Act of March 9, 1771, *supra;* Act of February 8, 1808, *supra.*

an act, passed eighteenth of April, one thousand eight hundred and fifty-three ... relative to floating logs in the Wallenpaupack river or creek, in Wayne and Pike counties, et cetera." Act of April 9, 1873, No. 601, 1873 Pa.Laws 573. During this same period the lumber trade along the Wallenpaupack River suffered greatly as vast tracts of forest were previously cut with little thought of saving smaller trees. *See Matthews, supra* at 706, 954; *Egle, supra* at 1049; C. Oplinger, *The Poconos: An Illustrated National History Guide,* 203 (New Brunswick: Rutgers University Press, 1988). Thus, the Wallenpaupack River's usefulness as an avenue of commerce for lumber products came to a close.

Because the Wallenpaupack River was historically used in the distant past to convey lumber products to market, the question now is whether this past usage together with the four prior legislative acts regarding the Wallenpaupack River are sufficient to show that the river still must be considered a public highway, therefore precluding PP & L from enjoining the sale of alcoholic beverages on these waters. "There is no natural right of the citizen, except the personal rights of life and liberty, which is paramount to his right to navigate freely the navigable streams of the country he inhabits." *Yoffee v. Pennsylvania Power & Light Company,* 385 Pa. 520, 534, 123 A.2d 636, 644 (1956)(citing *Flanagan v. City of Philadelphia,* 42 Pa. 219, 228 (1862)). No one can curtail the rights of a citizen using the rivers of the Commonwealth in aquatic navigation, so long as the citizen remains within the laws and regulations prescribed by the constituted authorities. *Id.*

On this continent the early settlers found large rivers with navigable tributaries, forming vast systems of internal communication, extending hundreds and in some instances thousands of miles above the reach of tide-water. The common law definition of a navigable river was unsuited to this state of things, and seems never to have been adopted in Pennsylvania; on the contrary, navigability in fact was made the test by which the character of a stream, as public or private, was determined, and the great but tideless rivers of the state were held to be navigable rivers, public highways, belonging to the state, and held for the use of all her citizens. The beds of such rivers, between the lines of ordinary low water, on their opposite sides, have not been granted out by the commonwealth to individuals, but continue to be held and controlled by and for the public: *Carson v. Blazer,* 2 Binn. 475; *Flanagan v. City of Phila.,* 42 Pa. 219.

*Fulmer v. Williams,* 122 Pa. 191, 206, 15 A. 726, 727–28 (1888).

In the case of all navigable rivers the beds in which they flow belong to the public. The right to the use of water follows the ownership of the bed in which it flows. The commonwealth is therefore the owner of the rivers and holds them for the use of its citizens. They are public property—natural highways—open to all who may have occasion to use them: *Carson v. Blazer, supra; Poor v. McClure,* 77 Pa. 214.

*Id.* at 207–08, 15 A. 726. *See City of Philadelphia v. Philadelphia Suburban Water Co.,* 309 Pa. 130, 144, 163 A. 297, 300 (1932).

The State's rule for rivers is well stated in *Cleveland & Pittsburgh Railroad Co. v. Pittsburgh Coal Co.,* 1935, 317 Pa. 395, [397] 176 A. 7, 9, as follows:

"Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water. *The Daniel Ball,* 10 Wall. 557, 563, 19 L.Ed. 999 [(1870)]; *The Montello,* 20 Wall. 430, 439, 22 L.Ed. 391; *United States v. Holt State Bank,* 270 U.S. 49, 46 S.Ct. 197, 70 L.Ed. 465 [(1926)]; *United States v. State of Utah,* 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 [(1931)]; *Flanagan v. City of Philadelphia,* 42 Pa. 219."

The difference in modes of trade and travel upon a long thin roadway of water joining regions and communities, which a river is, and upon a small lake, is obvious. Commerce may exist on both and it may move

on both, but such movement on a 150–acre lake, unless it is an adequate link in a chain of commercial intercourse, remains local and insignificant in comparison with the argosies of transport that move along the great rivers of the Commonwealth.

*Lakeside Park Co. v. Forsmark,* 396 Pa. 389, 391–92, 153 A.2d 486, 487 (1959).

"The use to which the body of water may be put is the true criterion. If the body of water is sufficiently large and deep to serve the public in providing transportation to any considerable extent upon its bosom, it is sufficient to give the public an easement therein, for the purpose of transportation and commercial intercourse."

*Id.* at 396, 153 A.2d at 490 (quoting *Conneaut Lake Ice Co. v. Quigley,* 225 Pa. 605, 610, 74 A. 648, 650 (1909)).

But in respect to the creeks and smaller streams everywhere found in Pennsylvania, the practice of the land-office, whether under the Proprietaries, or the Commonwealth, has been, to include them in warrants and surveys, as part of the public lands. Streams thus falling within the lines of a survey were covered by it, and belonged to the owner of the tract, who might afterwards convey the body of the stream to one person, and the adjoining land to another. When any of this class of streams formed the boundary of such tract, the grantee acquired title *ad filum aquae: Coovert v. O'Conner,* 8 Watts [470] 477. There is but one difference between a stream running through a man's land, and one which runs by the side of it; in the former case he owns the whole, and in the latter, but half: *Child v. Starr,* 20 Wend. 149. It is customary to speak of these streams as not navigable, in contradistinction to those larger rivers not granted by the Commonwealth, and which are called navigable. In England, those streams only are called navigable in which the tides ebb and flow; but with us, all our public rivers, whether fresh or salt, are navigable; and hence; a very erroneous idea has sprung that such rivers only are public highways, and that, in the lesser streams, granted by the Commonwealth to purchasers, the public have no rights until they are declared by law to be highways. *This is a misconception, produced, no doubt, by the very indefinite term navigable—a word which may mean an ascending as well as descending navigation, by boats of considerable burden—or merely a descending navigation, by arks and rafts, at all seasons— or by arks and rafts in seasons of freshets. Our ideas of public and private rights in streams of water, ought not to be dependent on so vague and indeterminate a word.*

If we go back to Magna Charta, we shall find it written in the 23 Cap. *"Omnes kidelli deponantur,"* & c.—a clause which has been translated, "All weirs from henceforth shall be utterly put down, by Thames and Medway, and through all England, but only by the sea coasts." This I understand to have been a formal declaration and vindication of the right of all up-stream people to have an unobstructed channel in streams capable of being used for transportation, not only for purposes of trade and commerce, but also for the ascent of fish, which sometimes were indispensable for subsistence. Accordingly, it is laid down by Lord HALE (see *Harvrave's Tracts, De Jure Maris,* cited in *Angell on Watercourses,* § 535), "All rivers above the flow of tide-water are, by the common law, *prima facie* private; but when they are naturally of sufficient depth for valuable floatage, the public have an easement therein for the purposes of transportation and commercial intercourse; and, in fact, they are public highways by water."

This, I apprehend, is an exact definition of our creeks and smaller rivers, such as have been granted by warrant and survey. *They are private property, but if of sufficient capacity, at any stages of water, to be used for transportation of lumber or other goods, they are held subject to that public easement which our English ancestry guarded with great jealousy, as numerous old statutes subsequent to Magna Charta abundantly attest. When, therefore, our legislature declare such streams to be public highways, the act is merely declaratory of the common law, but beneficial, nevertheless, as bringing the stream within the protection of the remedial provisions of the*

*Mill-dam Act of 1803.* This latter act is, by its terms, applicable to "any navigable stream of water *declared by law* a public highway;" and it is itself declaratory of the common law, in the clause which forbids him who erects or maintains a dam "to obstruct or impede the navigation of such stream, or prevent the fish from passing up the stream."

*The Barclay Railroad and Coal Company v. Ingham,* 36 Pa. 194, 200–02 (1860)(emphasis added). *See also Cassleman River,* 40 Pa.C 457, 459–61 (1912); Weston, *Public Rights in Pennsylvania Waters,* 49 Temple Law Quarterly 515, 527–35 (1976).

Additionally, our Supreme Court in *Deddrick v. Wood,* 15 Pa. 9 (1850), held that an Act declaring a creek to be a public stream or highway for the passage of boats and rafts and prohibiting any obstruction or impediment to navigation was also applicable to a body of logs being floated down the stream. The Supreme Court defined the term raft rather broadly in this opinion. *Id.* at 12–14. Thus, the Supreme Court held that the plaintiff could recover from the defendant when the dam and boom constructed by the defendant prevented the plaintiff from floating two thousand saw-logs to market via the Oswayo Creek in Potter County which had been declared a public highway by act of the legislature. *See also Pursell v. Stover,* 110 Pa. 43, 47, 20 A. 403, 404 (1885); *White Deer Creek Improvement Co. v. Sassaman,* 67 Pa. 415 (1871); *Dalrymple v. Mead,* 1 Grant 197 (1855).

A body of water once shown to be navigable in its natural state is presumed to be navigable and "forever free." *United States v. Appalachian Electric Power Co.,* 311 U.S. 377, 408, 61 S.Ct. 291, 299, 85 L.Ed. 243, 253 (1940); *Nekoosa Edwards Paper Co. v. Railroad Commission,* 201 Wis. 40, 46, 228 N.W. 144, 147 (1929), *affirmed,* 283 U.S. 787, 51 S.Ct. 352, 75 L.Ed. 1415 (1931); *Re Pennsylvania Water & Power Co.,* 31 P.U.R. 1, 5 (1938). Navigability, in the sense of the law, is not destroyed because a water course is interrupted by occasional natural obstruction. *Economy Light & Power Co. v. United States,* 256 U.S. 113, 123–24, 41 S.Ct. 409, 412, 65 L.Ed. 847, 855 (1921); *Pennsylvania Environmental Council, Inc. v. Bartlett,* 315 F.Supp. 238 (1970), *affirmed,* 454 F.2d 613 (1971). The character of navigable water is not changed by any subsequent economic or geographic developments resulting in a commercial disuse of a river for navigation. *Montana Power Co. v. Federal Power Commission, supra* at 494; *Re Pennsylvania Water & Power Co., supra* at 5 (citing *Arizona v. California, supra* at 453, 51 S.Ct. at 525, 75 L.Ed. at 1165); *State of Wisconsin v. Federal Power Commission,* 214 F.2d 334, 337 (1954), *cert. denied,* 348 U.S. 883, 75 S.Ct. 124, 99 L.Ed. 694 (1954)(the fact that a river had not been used for transportation of logs since 1924 was of little moment in deciding the navigability of a river).

Instantly, I decline to follow the holding in *Livingston by Livingston v. Pa. Power & Light Co.,* 609 F.Supp. 643, 646 (1985) that the Wallenpaupack River was always merely a point of interest, more suited to a private use rather than a public use.[14] Instead, I conclude that the four 19th century legislative acts concerning navigation on the Wallenpaupack River, together with its historical place as an important link in the chain of commercial intercourse involving the lumber trade in Wayne and Pike Counties is sufficient for the Wallenpaupack River to assume the status of a public highway under the criteria set forth in *Lakeside Park Co. v. Forsmark, supra.* The fact that a large waterfall existed at one time at the current site of PP & L's Wallenpaupack Hydroelectric Dam does not alter this status as the historical information reveals that the lumber was diverted around this bottleneck and continued its journey down the Wallenpaupack, Lackawaxen and Delaware Rivers before reaching its ultimate commercial destination in the City of Philadelphia. *See Pennsylvania Environmental Council, Inc. v. Bartlett,*

---

14. Pennsylvania courts are not bound by the decisions of inferior federal courts where the case specifically concerns Pennsylvania law. *Rader v. Pennsylvania Turnpike Commission,* 407 Pa. 609, 617, 182 A.2d 199, 203 (1962); *Com-monwealth v. Giffin,* 407 Pa.Super. 15, 26, 595 A.2d 101, 107 (1991); *Commonwealth v. Lacey,* 344 Pa.Super. 576, 582, 496 A.2d 1256, 1260 (1985).

*supra.* Additionally, the fact that the Wallenpaupack River's commercial use ended when the lumber trade ended and before the Wallenpaupack Hydroelectric Dam was constructed does not extinguish its status as a public highway. *See United States v. Appalachian Electric Power Co., supra* 311 U.S. 377, 61 S.Ct. 291, 85 L.Ed. 243 (1940); *Economy Light & Power Co. v. United States, supra; Nekoosa Edwards Paper Co. v. Railroad Commission, supra; State of Wisconsin v. Federal Power Commission, supra.*

Accordingly, I would hold that because the evidence submitted by PP & L at trial contains a large undocumented block of time encompassing the almost entire 19th century regarding the alleged non-use of the Wallenpaupack River for navigation, it failed to meet its burden of clearly refuting the legislative declaration in the Act of February 8, 1808, *supra,* that the Wallenpaupack River was a navigable body of water before the construction of the Wallenpaupack Hydroelectric Dam.[15] Moreover, I would hold that while PP & L may in fact hold title to most of the bed of Lake Wallenpaupack, its title to this property is subject to a public easement to utilize the waters for the purpose of navigation. Thus, utilizing the same statutory and historical analysis employed by our Supreme Court in *Baird v. Rice, supra,* I believe that the permanent injunction precluding Maritime Management, Inc. from selling alcoholic beverages pursuant to a validly issued liquor license on board its boat, the Spirit of Paupack, while it cruises the waters of a public highway must be dissolved. Hence, I respectfully dissent.

OLSZEWSKI, Judge, concurring.

I agree wholeheartedly with the well-reasoned majority opinion and join without reservation in both its analysis and holding.

I feel it necessary, however, to write separately in order to address the very premise upon which the dissent bases its rationale. Before delving into an exhausting and lengthy, albeit informative, history of the importance of the Wallenpaupack River to our Pennsylvania ancestors, the dissent acknowledges that not one iota of the evidence upon which it relies is of record.

Undeterred, the dissent claims that its *sua sponte* historical undertaking is permissible because "[a] court sitting in equity may consult historical books of authority though not introduced into evidence, or may admit such works to aid it in the exercise of judicial functions." *Dissenting opinion* at 597 (citing *Baird v. Rice,* 63 Pa. 489 (1871), and *In re Siemens' Estate,* 346 Pa. 610, 613, 31 A.2d 280, 282 (1943) (citations omitted)).

While this may be an accurate statement of the law with respect to trial courts sitting in equity, the same is not true with respect to appellate courts. Indeed, a close reading of the authorities cited by the dissent reveals that the *Baird* and *In re Siemens' Estate* decisions do not support this proposition.

A careful analysis of the procedural history in *Baird* reveals that, in an unusual twist, our Supreme Court was not sitting as an appellate court when it consulted historical treatises to aid its decision making. A preliminary injunction hearing was held on December 3, 1870, after which a temporary injunction was granted prohibiting construction of Philadelphia's City Hall. The hearing was continued for one month before deciding whether the injunction would be made permanent. On January 4, 1871, the hearing was continued before our Supreme Court, sitting as assessors.[1] The Court considered a multitude of evidence, including old maps and books, before determining that the preliminary injunction was improvidently granted and should not be made permanent.

*Baird,* therefore, merely stands for the proposition that an appellate court sitting as a trial court may consult historical writings. There is no support for extending this rationale further to permit appellate courts sitting

---

15. *See also* Act of March 11, 1833, *supra;* Act of April 18, 1853, *supra;* Act of April 9, 1873, *supra.*

1. An assessor is defined as "[a]n officer chosen or appointed to appraise, value, or assess property. A person learned in some particular science or industry, who sits with the judge on the trial of a cause requiring such special knowledge and gives his advice." Black's Law Dictionary, 6th Ed. (1990).

in their traditional fashion to act in a like manner.[2]

Likewise, *In re Siemens' Estate* cannot support the dissent's position. The passage relied upon from *In re Siemens' Estate* is, in actuality, a quote from the trial court's opinion in which the court sought to explain why it took judicial notice of the fact that a testator's gift to the "Penna. S.P.C.A." designated the Pennsylvania Society for the Prevention of Cruelty to Animals. *In re Siemens' Estate*, 346 Pa. at 613, 31 A.2d at 282 ("a court may inform itself from books of authority though not introduced into evidence, or may admit such works to aid it in the exercise of judicial functions").

That the present case differs diametrically from both *Baird* and *In re Siemens' Estate* should be readily apparent, and their holdings should not be contorted and offered as precedent to permit or condone the unnecessary and unwarranted analysis that comprises the dissenting opinion.

Should the dissent actually want to follow precedent, it would do better to inform itself of the plethora of caselaw in our Commonwealth which holds that evidence not of record cannot be considered by appellate courts. *See, e.g.,* Pa.R.A.P.1921; *Commonwealth v. Bracalielly*, 540 Pa. 460, 475–76, 658 A.2d 755, 763 (1995); *Commonwealth v. Baker*, 531 Pa. 541, 558–60, 614 A.2d 663, 672 (1992); *Tukovits v. Prudential Ins. Co. of America*, 448 Pa.Super. 540, 544–46, 672 A.2d 786, 788 (1996); *Commonwealth v. Dunkel*, 443 Pa.Super. 66, 69–70, 660 A.2d 1347, 1349–50 (1995); *Eadie v. Bohatch*, 411 Pa.Super. 304, 306–08, 601 A.2d 361, 362 (1992); *Murphy v. Murphy*, 410 Pa.Super. 146, 155–57, 599 A.2d 647, 652 (1991).

While we may have the resources to do so, it is not and should not be the function of this Court to act as counsel for the litigants. Indeed, such behavior runs contrary to the steadfast notion that our courts are neutral arbiters and not partial litigants with natural predilections to present evidence biased in their favor.

Thus, regardless of the accuracy of the protracted narration offered by the dissent relative to our ancestors' reliance upon the Wallenpaupack River in days of yore, this Court is bound to consider only that evidence which the parties below found relevant to their cause and properly introduced into the record.

---

**2.** Moreover, even if the dissent was correct that our Supreme Court in *Baird*, sitting as an appellate court, did consult historical materials outside the record to aid its decision making, I would hold that this precedent has been implicitly overruled. In the intervening 126 years since the *Baird* decision, both this Court and our Supreme Court have held that appellate review is limited to a consideration of evidence properly introduced into the record. With this in mind, I would be wary of compounding an error made by our high Court so many years ago.